CLOVER LEAF CREAMERY COMPANY, et al., Respondents,

v.

STATE of Minnesota, Appellant.

No. 48827.

Supreme Court of Minnesota.

Sept. 7, 1979.

Rehearing Denied Oct. 31, 1979.

Certiorari Granted March 31, 1980. See 100 S.Ct. 1596.

Warren Spannaus, Atty. Gen., Byron E. Starns, Chief Deputy Atty. Gen., and Kenneth E. Raschke, Jr., Asst. Atty. Gen., St. Paul, for appellant.

Briggs & Morgan, Leonard J. Keyes, Douglas L. Skor and Andrea M. Bond, St. Paul, for respondents.

James D. Miller, Minneapolis, for Minnesota Public Interest Research Group, amicus curiae.

PETERSON, Justice.

Defendant, state of Minnesota, appeals from the trial court's judgment in favor of plaintiffs,[1] holding L. 1977, c. 268 (the Act), to be unconstitutional.[2] We affirm the trial

---

1. Plaintiffs generally may be divided into two categories—those involved in the packaging and sale of milk; those involved in the production and sale of plastic goods and associated equipment.

The first category includes:
1. Clover Leaf Creamery Company
2. Marigold Foods, Inc.
3. Wells Dairy, Inc.
4. Weber & Barlow Stores, Inc.

The second category includes:
1. The Society of the Plastics Industry, Inc.
2. Phillips Petroleum Company
3. Hoover Universal, Inc., formerly Hoover Ball and Bearing Company
4. M–H Packaging Systems, Inc.

2. The trial court held L. 1977, c. 268, to be unconstitutional on three grounds:

(1) The Act deprives plaintiffs of equal protection of the law in contravention of U. S. Const. Amend. XIV;

(2) The Act deprives plaintiffs of substantive due process of law in contravention of U. S.

court's judgment and hold that the Act violates the equal protection clause of the Fourteenth Amendment to the United States Constitution, because it establishes a classification which is not rationally related to a legitimate state interest.

The Act, approved on May 26, 1977, provides:

"Section 1. The legislature finds that the use of nonreturnable, nonrefillable containers for the packaging of milk and other milk products presents a solid waste management problem for the state, promotes energy waste and depletes natural resources. The legislature therefore, in furtherance of the policies stated in Minnesota Statutes, Section 116F.01, determines that the use of nonreturnable, nonrefillable containers for packaging milk and other milk products should be discouraged and that the use of returnable and reusable packaging for these products is preferred and should be encouraged.[3]

"Sec. 2. Subdivision 1. No person shall sell at retail or offer for sale at retail in this state any milk or fluid milk product as defined in Minnesota Statutes, Section 32.391, other than sour cream, cottage cheese and yogurt, in a nonre-turnable, nonrefillable rigid or semi-rigid container at least 50 percent of which is plastic.

"Subd. 2. A violation of subdivision 1 is a misdemeanor and each day of violation is a separate offense.[4]

"Sec. 3. This act is effective July 1, 1977."[5]

We note three specific aspects of this unique statute:[6] (1) The Act does not, under any circumstances, permit the use of nonrefillable[7] plastic containers for milk;[8] (2) milk is the only commodity affected by the Act, plastic containers are not banned unless they are filled with milk; and (3) only plastic nonrefillable milk containers are affected by the Act, paper nonrefillable milk containers are not affected.[9]

■ Plaintiffs contend the Act violates the equal protection clause of the Fourteenth Amendment because it creates a classification in which paper containers are to be preserved while plastic nonrefillables are to be banned. Because the present statute involves economic regulation, the relevant test is whether the classification is rationally related to a legitimate state interest. *New Orleans v. Dukes*, 427 U.S.

Const. Amend. XIV and Minn. Const. art. 1, § 7; and

(3) The Act constitutes an unreasonable burden upon interstate commerce in contravention of U. S. Const. art. I, § 8.

3. Laws 1977, c. 268, § 1, codified as Minn. St. 116F.21.

4. Laws 1977, c. 268, § 2, codified as Minn. St. 116F.22.

5. Laws 1977, c. 455, § 96, superseded L. 1977, c. 268, § 3, and provided, in part: "Notwithstanding any law to the contrary, no prohibition on the retail sale or the offer for retail sale of milk in nonreturnable, nonrefillable plastic containers shall be effective prior to July 1, 1978."

6. Minnesota is the only state that has legislatively banned nonrefillable plastic milk containers. Ontario, Canada, has banned both plastic and paper nonrefillable milk containers by executive action.

7. The Act mentions "nonreturnable, nonrefillable containers." A container can be returnable without being refillable. For example, the plas-tic milk bottle banned by the Act can be returned for recycling, but it cannot be used again to package milk. The term "nonrefillables" is therefore used throughout this opinion to describe milk containers which cannot be used again for the same purpose.

8. The container referred to is a high density polyethylene plastic container which cannot be returned to the dairy to be refilled with milk for sale to consumers. For the remainder of the opinion, these containers will be referred to as "plastic nonrefillables."

9. The container referred to is a plastic coated, paperboard container which cannot be returned to the dairy to be refilled with milk for sale to customers. The container is composed of bleached kraft paper coated with low density polyethylene, a plastic related to that used in plastic nonrefillable milk containers. Low density polyethylene comprises about 10 percent of the weight of the container. For the remainder of the opinion, these containers will be referred to as "paper containers."

297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976). Plaintiffs argue that a rational classification is not established because, from an environmental standpoint, paper containers are not superior to plastic nonrefillables, and a ban on plastic nonrefillables will serve to encourage the use of paper containers instead of serving to encourage the use of refillable milk containers.

The Act is intended to further the policies stated in Minn.St. 116F.01; therefore, it is intended to promote the state interests of encouraging the reuse and recycling of materials and reducing the amount and type of material entering the solid waste stream. L. 1977, c. 268, § 1. Specifically, the stated legislative finding of the Act is that nonrefillable milk containers present solid waste management problems, promote energy waste, and deplete natural resources; the stated legislative goal is that use of returnable milk containers should be encouraged. L. 1977, c. 268, § 1. The Act, undoubtedly, deals with legitimate state interests. The crucial question is whether the classification separating paper containers from plastic nonrefillables is reasonably related to these state interests.

We are aware of the deference that is accorded to the legislature when the present type of statute is analyzed on equal protection grounds. Nevertheless, our inquiry into the constitutional propriety of the present classification separating paper containers from plastic nonrefillables is dependent upon facts. Based upon the relevant findings of fact by the trial court, supported by the record, and upon our own independent review of documentary sources, we believe the evidence conclusively demonstrates that the discrimination against plastic nonrefillables is not rationally related to the Act's objectives. Considering only the specific areas of solid waste management, energy waste, and depletion of natural resources, it is clear that the environmental effects of paper containers are not less harmful than the effects of plastic nonrefillables. It is also apparent that the classification will not further the Act's stated goal of encouraging the use of refillable milk containers.

The record supports the trial court's finding that plastic nonrefillables present fewer solid waste management problems than paper containers. The major method of solid waste disposal is by landfill deposit. The evidence at trial established that plastic nonrefillables are superior to paper containers for landfill disposal.

Defendant's expert witnesses agreed that the principal environmental hazards posed by landfill disposal are pollution of underground water, which is caused by leaching, and the creation and escape of methane gas. Both of these environmental hazards are created by waste decomposition. Bacterial and other chemical reactions, combined with percolation of water and other liquids, create leachates which seep into the ground and ultimately into underground water. The same reactions create methane gas, which is both noxious and explosive. Paper milk containers contribute to these environmental hazards because they begin to decompose as soon as the plastic coating on the exterior of the container is punctured or torn. Plastic nonrefillables are essentially inert and therefore do not contribute to the creation of leachates and methane gas.

Maintaining landfill stability is important in landfill disposal for two reasons. First, stability minimizes cracking of the final landfill cover. Such cracking results in the generation of leachates. Second, landfill stability encourages productive use of the landfill site after the landfill project is completed. Because waste decomposition creates landfill instability, plastic nonrefillables contribute to landfill stability while paper containers do not.

The trial court's finding that plastic nonrefillables and paper containers occupy substantially the same amount of landfill space is also justified by the evidence. Plastic nonrefillables contain less raw material and have greater density than paper containers. If total compaction (no void spaces left in containers) is achieved, plastic nonrefillables will occupy less landfill space. The evidence at trial demonstrated that during collection waste is typically compacted to a

fraction of its original volume, that it is compacted further when deposited at the landfill, and that it has continual pressure exerted upon it as other layers of waste are deposited. Under these conditions, there is no basis for asserting that plastic nonrefillables occupy more landfill space than paper containers.[10]

Data in a 1977 final report by Midwest Research Institute (MRI) and the United States Environmental Protection Agency (EPA)[11] supports defendant's argument that plastic nonrefillables take more landfill space than paper containers; however, accuracy of the figures in the MRI report was persuasively attacked by plaintiffs' expert witnesses. Highly significant was the testimony of Richard Welch, a chief investigator involved in the MRI report. Welch indicated that in the first draft of the MRI report it was assumed, based upon conversations with experts, that plastic nonrefillables and paper containers would compress to within 10 percent of their original volume. The American Paper Institute then provided MRI with a study prepared by the Weyerhaeuser Corporation involving the compressibility of milk containers. The test

used in the Weyerhaeuser study indicated that paper was superior to plastic. MRI incorporated the Weyerhaeuser finding in its final report because no other written documentation was available. Welch criticized the test conducted by Weyerhaeuser because it neglected to specify the weights of the containers used and because the test was conducted in a laboratory, not under conditions approximating those found in a landfill.[12] William E. Ades of the EPA testified that he too was less confident of compressibility figures in the MRI report than of figures in other categories of container comparison. Welch further testified there was insufficient evidence to conclude that either type of container would consume more landfill space than the other. The contrary conclusion of defendant's solid waste expert, Harold Samtur, was based upon a weak and inconclusive foundation[13] and, as the trial court indicated, lacked convincing quality.

Solid waste disposal is also achieved by incineration, a method of disposal in which plastic nonrefillables are superior to paper containers. Although currently not widespread, incineration will become more prev-

10. Plaintiffs provided a relevant demonstration of compaction during the cross-examination of defendant's solid waste expert, Harold Samtur. Counsel for plaintiff crushed samples of both containers with his bare hands. Samtur estimated that the crushed volume of each container was between 10 and 20 percent of its original volume. He further acknowledged that there was virtually no springback of the plastic nonrefillable after it had been crushed and released and that the springback which did occur could be eliminated by squeezing the container between thumb and forefinger.

11. The report, entitled "Resource and Environmental Profile Analysis of Five Milk Container Systems," was an objective quantification of resource and environmental impacts associated with five milk container systems, including paper containers and plastic nonrefillables, and was the primary source of documentary evidence at trial on the environmental effects of paper containers and plastic nonrefillables. For the remainder of this opinion, the report will be referred to as the "MRI report."

12. In this test, the volume of a container was measured after the container was crushed with a laboratory device and the device was totally released, with no continual pressure exerted

upon the container. The evidence at trial indicated waste is compacted to a fraction of its original volume during collection, is compacted even further when deposited at a landfill, and has continual pressure exerted upon it as other layers of waste are deposited.

13. Harold Samtur relied upon three sources for his conclusion: One, the MRI report. (Samtur accepted the compressibility figures of the MRI report without examining their derivation, in spite of Welch's testimony about their inadequacy.) Two, a 1972 report prepared by a milk packaging working group for the Ministry of the Environment in the Province of Ontario, Canada. (The Ontario researchers estimated the compaction ratio for a refillable plastic milk container and then assumed that the much lighter plastic nonrefillable would consume the same space. The group also used a nonrefillable plastic milk container incomparable to the container now used in Minnesota, because it was almost 50 percent heavier and was more difficult to crush.) Three, a 1969 study, the "Eggshell Report," on the disposable characteristics of containers. (The study did not include samples of milk containers.)

alent as technology advances and the energy value of the heat generated by it can be economically utilized. Both plastic nonrefillables and paper containers burn, but plastic nonrefillables have a much higher Btu value, which results in the recovery of more energy than can be recovered from burning paper containers. Moreover, plastic nonrefillables incinerate completely and do not emit noxious gases into the atmosphere, while paper containers leave residue and emit small amounts of noxious gases.

Recycling is yet another method of solid waste disposal. One of the express purposes of Minn.St. c. 116F is to encourage the reuse and recycling of materials. Plastic nonrefillables are recyclable because they can be ground and used to make a large number of polyethylene products.[14] Paper containers are not recyclable because the paperboard and the plastic coating cannot be separated.

"Source reduction" is a further aid in solid waste management and is similarly an express goal of Minn.St. c. 116F. In the present case, the major relevant source-reduction factor is the constantly declining weight of plastic nonrefillables. Plastic nonrefillables weigh a fraction more than half the weight of paper containers and therefore generate less waste. While the unit weight of gallon paper containers has remained at 115 grams or more for at least the past 5 years, improvements in resin, production machinery, and container design have brought about substantial reduction in the weight of plastic nonrefillables.[15] Such a reduction in weight causes a proportional decrease in the amount of raw material used and the amount of waste generated,

along with lessened impacts in other environmental categories.[16]

The evidence conclusively demonstrates that plastic nonrefillables present fewer solid waste problems than paper containers.

Similarly, in the category of energy waste, the evidence establishes that paper containers are not superior to plastic nonrefillables. While the figures in the MRI report on energy consumption support defendant's position that less energy is required to produce paper containers, the accuracy of the figures was successfully eroded by plaintiffs. Computed in the MRI report were two values for the amount of energy consumed in the production of paper containers. The higher figure included, while the lower figure excluded, the energy value of the wood waste (wood bark and sawdust) generated by the paper manufacturing process. When MRI included the energy value derived from burning wood waste (resulting in a higher figure and a higher level of adverse environmental impact), paper containers were slightly superior to plastic nonrefillables. When MRI did not include the energy value derived from burning wood waste (resulting in a lower figure and a lower level of environmental impact), paper containers were superior. However, MRI's figures for plastic nonrefillables did not take into consideration the effect of the energy value of the waste gases produced in making high density polyethylene. Welch, a chief investigator in the MRI report, testified that a meaningful comparison between plastic nonrefillables and paper containers in the category of energy consumption requires inclusion of

---

14. The evidence indicates that plaintiff Clover Leaf Creamery Company has a voluntary plastic milk container recycling program. Clover Leaf picks up plastic milk containers that are returned to retail stores, grinds them, and sells the plastic material to a salvage dealer.

15. In 1964, gallon plastic nonrefillables made on blow-molding machines manufactured by plaintiff Hoover Universal, Inc. weighed 100 grams per unit. By 1973, plastic nonrefillables generally used in the dairy industry weighed 70 grams each, the weight used in the MRI report. Blow-molding machines are currently manufac-

tured to mold 60-gram bottles. The average weight used throughout the country, including Minnesota, is currently 65 grams. One Hoover dairy customer presently uses 57-gram containers.

16. Defendant argues that some reduction will occur under the Act, because use of refillable milk containers will be encouraged. As discussed later in this opinion, the evidence conclusively demonstrates that increased use of refillable milk containers will not be the result of a ban on plastic nonrefillables.

wood waste energy in computing the amount of energy consumed in producing paper containers. Welch's testimony was properly credited by the trial court.[17] In its tests, MRI used plastic nonrefillables weighing 70 grams. The average weight of plastic nonrefillables now used in Minnesota is 65 grams. If 65-gram plastic nonrefillables are used and the energy value derived from burning wood waste is included in energy consumption figures for paper containers, the figures demonstrate that production of plastic nonrefillables requires less energy than production of paper containers.[18]

The evidence introduced at trial therefore demonstrates that production of plastic nonrefillables does not require more energy than production of paper containers. The evidence also establishes that the amount of oil and natural gas consumed in the production of high density polyethylene for plastic nonrefillables is negligible and that banning plastic nonrefillables will not increase the volume of natural gas or oil presently marketed for heating or fuel purposes. Thus, drawing a distinction between plastic nonrefillables and paper containers is not reasonably related to the state's interest in preventing energy waste.

Furthermore, drawing a distinction between plastic nonrefillables and paper containers is not reasonably related to the state's interest in conserving natural resources. In spite of the fact that timber is considered to be a renewable resource and

oil and natural gas are considered to be nonrenewable resources, the evidence demonstrates that banning plastic nonrefillables will not result in lower consumption of natural resources. The amount of crude oil and natural gas used for producing plastic nonrefillables is so small that a ban on plastic nonrefillables will not alter the volume of resources consumed for non-fuel purposes. If any container is likely to have the potential for reducing depletion of natural resources, it is the plastic nonrefillable. The record establishes that the weight of plastic nonrefillables is continually being reduced and that plastic nonrefillables are recyclable.[19]

The evidence conclusively establishes that the stated goal of the Act, to encourage or promote a return to the use of refillable milk containers, will not be furthered by banning plastic nonrefillables. In 1977, plaintiff Clover Leaf Creamery Company made an effort to revive refillable milk containers in Minnesota and found that consumers would not purchase milk in refillable bottles, even when the only alternatives in some instances were paper containers. Clover Leaf was forced to take back large quantities of milk and finally sold several thousand unused refillable containers at a loss. The rejection of refillable containers occurred even though the cost to retailers was 4 cents less per gallon for returnable containers than for nonrefillable containers and even though thousands of dollars were spent in promoting refillable milk contain-

17. The evidence at trial indicated that the petroleum industry has, for years, used waste gases to fuel or power various processes. However, it is difficult to pinpoint what amount of energy used in petro-chemical processing represents waste energy. The plastics industry generally does not break down the sources of energy used in these processes, because it would be extremely difficult to engage in such an inquiry.

18. Furthermore, the evidence demonstrates that if the energy value of raw material in each container is excluded or included in determining the amount of energy needed to produce the container, plastic nonrefillables are environmentally superior to paper containers.
    Richard Welch, a chief investigator for MRI, concluded that the energy impact of plastic

nonrefillables and paper containers is virtually the same.

19. When other environmental factors are considered, the superiority of plastic nonrefillables is more evident. For example, the MRI report analyzed factors in addition to energy and compressibility. Using 70-gram plastic nonrefillables, the study demonstrated that production of paper containers (1) consumes more water; (2) generates more water-borne waste; (3) consumes greater quantities of raw materials; and (4) generates more industrial solid waste than plastic nonrefillables. However, the MRI report indicated that paper containers are environmentally superior in the category of atmospheric emissions.

ers. The evidence also indicated that in Ontario, where both plastic nonrefillables and paper containers were administratively banned in 1972, consumers have turned to a third nonrefillable container, the "plastic pouch," as an alternative to refillable containers. Whereas 47 percent of the milk containers used in Ontario in 1971 were refillable, in 1977, the percentage was 19.7.

The evidence demonstrates that convenience is an important factor for consumers and that consumers will therefore use paper containers instead of refillables if plastic nonrefillables are banned. The environmental effects of producing, using, and disposing of paper containers are not less harmful than the environmental effects associated with plastic nonrefillables.

Defendant argues that even if it is assumed that paper containers are not environmentally superior to plastic nonrefillables, the classification drawn in the Act is rationally related to another legitimate state interest—prohibiting the use of plastic nonrefillables before a significant foothold is acquired in the Minnesota milk market.

Defendant argues that the Act was initiated in response to a move in late 1976 by major Minnesota dairies to a long term commitment to packaging milk in plastic nonrefillables. Defendant reasons that the undoubted consumer convenience of plastic nonrefillables combined with the capital investment in machinery designed to produce plastic nonrefillables and the economic gains to be made by maximizing production would have effectively eliminated any likelihood that the Minnesota dairy industry would later voluntarily turn to refillable containers. Defendant also argues that because nationwide trends indicate plastic nonrefillables dominate in any milk market, it may have been the legislature's concern that if it failed to ban plastic nonrefillables, future regulation against plastic nonrefillables would become too disruptive economically and therefore impossible to achieve. In other words, defendant asserts that the legislature may have believed that if action was not taken to limit the introduction of plastic nonrefillables, they would become

immovably entrenched in Minnesota. The evidence indicates, however, that in the early 1970's use of plastic nonrefillables had been established in many areas of Minnesota, excluding the Twin Cities metropolitan area.

The state interest asserted by defendant is, on this record, speculative and illusory. The gravamen of defendant's argument is that by presently banning plastic nonrefillables, the legislature will, in the future, be better able to promote environmentally sound milk packaging, such as refillable containers. However, the evidence at trial indicates that the Minnesota Pollution Control Agency does not presently plan to take or propose further action on the subject of milk containers. Similarly, action by the Minnesota Legislature is uncertain, if not highly doubtful. The original version of the Act included a provision banning paper containers, but that provision was eventually removed from the Act. There is no evidence, therefore, that paper containers will cease to be used in the Minnesota milk market. Because paper containers are not environmentally superior to plastic nonrefillables, any asserted environmental benefit in preventing plastic nonrefillables from being widely used in Minnesota is illusory.

■ Defendant nevertheless contends that the Act should be upheld as a first step toward solving the overall problem of milk container waste. We do not doubt that legislatures may implement economic programs step by step, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations. See, e. g., *Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). However, such a step must, at the very least, have a rational relationship to achievement of a legitimate state interest. In the present case, the result of the Act, at best, will not be a step toward amelioration of a perceived evil. The evidence is conclusive that paper containers are not environmentally superior to plastic nonrefillables.

We hold that the Act violates the equal protection clause of the Fourteenth Amendment to the United States Constitution because it establishes a classification which is not rationally related to a legitimate state interest.[20]

Affirmed.

WAHL, Justice (dissenting).

While I am persuaded by the evidence cited by the majority which indicates that plastic nonrefillables are no worse, from an environmental standpoint, than paper nonrefillables, I cannot agree that the plastic nonrefillables ban, struck down today, is not "rationally related to a legitimate state interest." I view it as a constitutionally permissible "first step" in a pro-environmental effort on the part of the legislature.

The Court in *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), upheld, *per curiam*, the constitutionality of a New Orleans ordinance prohibiting the sale of foodstuffs from pushcarts, except by vendors who had continually operated such a vending business within the French Quarter for 8 years. That classification effectively operated to disqualify all food vendors except two, and there was no reason to believe the two were more likely than any others to "preserve the traditions" of the French Quarter, the ordinance's alleged purpose. To the charge that the classification was "a totally arbitrary and irrational method of achieving the city's purpose," the Supreme Court answered:

" * * * rather than proceeding by the immediate and absolute abolition of all pushcart food vendors, the city could rationally choose initially to eliminate vendors of more recent vintage. This gradual approach to the problem is not constitutionally impermissible." 427 U.S. at 305, 96 S.Ct. at 2517.

The court articulated the role of the judiciary with respect to legislative economic regulations as follows:

"States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude. Legislatures may implement their program step by step, *Katzenbach v. Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), in such economic areas, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations. See, e. g., *Williamson v. Lee Optical Co.*, 348 U.S. 483, 488–489, 75 S.Ct. 461, 464–65, 99 L.Ed. 563 (1955). In short, the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines, see, e. g., *Day-Brite Lighting, Inc. v. Missouri*, 342 U.S. 421, 423, 72 S.Ct. 405, 407, 96 L.Ed. 469 (1952); in the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment. See, e. g., *Ferguson v. Skrupa*, 372 U.S. 726, 732, 83 S.Ct. 1028, 1032, 10 L.Ed.2d 93 (1963)." 427 U.S. at 303–304, 96 S.Ct. at 2517.

Given such instruction by the highest court in the land, I fail to see how we can distinguish the milk container legislation struck down here from the pushcart vendor prohibition upheld in *New Orleans v. Dukes*. Regardless of the environmental superiority, found by the majority, of plastic over paper containers, the legislature is free to use a "stepwise" approach, adopting only a partial solution to the waste problem. The legislature could rationally conclude that allowing the plastic nonrefillables to become entrenched in Minnesota would hin-

20. The trial court treated plaintiffs' equal protection and substantive due process attacks as separate questions; but under substantive due process analysis, the means chosen by the challenged legislation similarly must bear a rational relationship to the public purpose sought to be served. See, e. g., *Federal Distillers, Inc. v.*

*State*, 304 Minn. 28, 46, 229 N.W.2d 144, 158 (1975). The trial court also concluded that the Act constitutes an unreasonable burden on interstate commerce in contravention of art. I, § 8, of the United States Constitution; but because of our decision on equal protection grounds, we do not consider that issue.

der future efforts to force the dairy industry to utilize more environmentally acceptable containers.

The majority concludes that "further action on the subject of milk containers * * by the Minnesota Legislature is uncertain, if not highly doubtful," citing as evidence the fact that an earlier version of the bill had contained a provision banning paper nonrefillables as well, which provision was eventually removed. However, it is at least arguable that such evidence leads to precisely the opposite conclusion—the same conclusion which might be drawn from the following statements made by senators at the debates on the nonrefillables bill, transcribed and entered in the trial record as Exhibit J:

> "Senator Spear: ' * * * It is true that our alternative now is not a returnable system in terms of milk bottles. Hopefully we are eventually going to be able to move to that kind of a system, but we are never going to move to a returnable system so long as we allow another nonreturnable system with all the investment and all of the vested interest that is going to involve to begin.' " Full Senate Floor Discussion, 70th Legislature, May 20, 1977.

> "Senator Luther: ' * * * the real direction that we should be headed in the state of Minnesota in terms of packaging, is a returnable system. * * * There will be arguments made here today about how the paperboard container is comparable to the throwaway plastic. That is not the issue that is before us. The issue before us is whether we should go into another throwaway plastic system that will be very, very difficult to convert from.' " Full Senate Floor Discussion, 70th Legislature, May 20, 1977.

The U.S. Supreme Court has frequently observed that a step-by-step approach in economic regulation is permissible, see, e. g., *New Orleans v. Dukes*, supra; *Katzenbach v. Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), and cases cited therein, and has never required actual evidence that a legislature intends to take a further step in the near future in the relevant economic area being regulated. Here, however, it is at least fair to conclude from the legislative history that the Minnesota legislature indeed intended that the bill banning plastic nonrefillables would be a "first step" in the environmental effort. The U.S. Supreme Court's cautions are well taken here; it is not for this court "to judge the wisdom or desirability of legislative determinations" in this area of economic regulation.

The majority opinion, in its discussion of the Ontario experience with a ban on all nonrefillable milk containers, suggests that such a total ban was actually detrimental to environmental efforts, pointing to evidence that the market share of refillables has dropped since the ban was enacted. Trial evidence established, however, that the plastic pouch is clearly superior from an environmental standpoint to both plastic and paper nonrefillables. Thus, while the measure perhaps did not have precisely the effect intended, it nevertheless had salutary environmental impact. To suggest that such a total ban would not benefit the environment is not only contrary to the evidence; it undermines any attempts on the part of the legislature to proceed with "complete elimination of the evil," an effort of which the plastic nonrefillables was but the first step.

Because I believe that Chapter 268, here declared unconstitutional, was precisely the type of regulation which the U.S. Supreme Court sanctioned in *New Orleans v. Dukes*, I respectfully dissent from this court's holding that this measure denies equal protection. Having found that Chapter 268 withstands the equal protection challenge, I would further hold that it is not in violation of the commerce clause, *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 440, 98 S.Ct. 787, 793, 54 L.Ed.2d 664, 674 (1978), or the due process clause, *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 124–125, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91, 99 (1978); *Federal Distillers, Inc. v. State*, 304 Minn. 28, 38, 229 N.W.2d 144, 154 (1975), but is a constitutional exercise of legislative powers.