# MINNESOTA *v.* CLOVER LEAF CREAMERY CO. ET AL.

No. 79–1171.   Argued November 3, 1980—Decided January 21, 1981

457

BRENNAN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, MARSHALL, and BLACKMUN, JJ., joined. POWELL, J., filed an opinion concurring in part and dissenting in part, *post*, p. 474. STEVENS, J., filed a dissenting opinion, *post*, p. 477. REHNQUIST, J., took no part in the consideration or decision of the case.

*Kenneth E. Raschke, Jr.,* Assistant Attorney General of Minnesota, argued the cause for petitioner. With him on the briefs were *Warren Spannaus,* Attorney General, *Richard B. Allyn,* Chief Deputy Attorney General, and *D. Douglas Blanke,* Special Assistant Attorney General.

*Leonard J. Keyes* argued the cause for respondents. With him on the brief were *Douglas L. Skor* and *Andrea M. Bond.*

*Harlon L. Dalton* argued the cause for the United States as *amicus curiae* urging reversal. On the brief were *Solicitor General McCree, Assistant Attorney General Moorman, Deputy Solicitor General Claiborne, Harriet S. Shapiro, Jacques B. Gelin,* and *Anne H. Shields.*[*]

JUSTICE BRENNAN delivered the opinion of the Court:

In 1977, the Minnesota Legislature enacted a statute banning the retail sale of milk in plastic nonreturnable, nonrefillable containers, but permitting such sale in other nonreturnable, nonrefillable containers, such as paperboard milk cartons. 1977 Minn. Laws, ch. 268, Minn. Stat. § 116F.21 (1978). Respondents[1] contend that the statute violates the Equal Protection and Commerce Clauses of the Constitution.

I

The purpose of the Minnesota statute is set out as § 1:

"The legislature finds that the use of nonreturnable, nonrefillable containers for the packaging of milk and other milk products presents a solid waste management problem for the state, promotes energy waste, and depletes natural resources. The legislature therefore, in

---

[*]*Stephen J. Snyder* filed a brief for the Sierra Club as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *C. Lee Cook, Jr., John C. Berghoff, Jr.,* and *Stephanie W. Kanwit* for the Can Manufacturers Institute et al.; by *John M. Cannon* for the Mid-America Legal Foundation; and by *Michael L. Flanagan* for the Minnesota Dairies Federation.

[1] Respondents, plaintiffs below, are a Minnesota dairy that owns equipment for producing plastic nonreturnable milk jugs, a Minnesota dairy that leases such equipment, a non-Minnesota company that manufactures such equipment, a Minnesota company that produces plastic nonreturnable milk jugs, a non-Minnesota dairy that sells milk products in Minnesota in plastic nonreturnable milk jugs, a Minnesota milk retailer, a non-Minnesota manufacturer of polyethylene resin that sells such resin in many States, including Minnesota, and a plastics industry trade association.

furtherance of the policies stated in Minnesota Statutes, Section 116F.01,[2] determines that the use of nonreturnable, nonrefillable containers for packaging milk and other milk products should be discouraged and that the use of returnable and reusable packaging for these products is preferred and should be encouraged." 1977 Minn. Laws, ch. 268, § 1, codified as Minn. Stat. § 116F.21 (1978).

Section 2 of the Act forbids the retail sale of milk and fluid milk products, other than sour cream, cottage cheese, and yogurt, in nonreturnable, nonrefillable rigid or semirigid containers composed at least 50% of plastic.[3]

The Act was introduced with the support of the state Pollution Control Agency, Department of Natural Resources, Department of Agriculture, Consumer Services Division, and Energy Agency,[4] and debated vigorously in both houses of the state legislature. Proponents of the legislation argued that it would promote resource conservation, ease solid waste disposal problems, and conserve energy. Relying on the results of studies and other information,[5] they stressed the need to

---

[2] Minnesota Stat. § 116F.01 (1978) provides in relevant part:

*"Statement of policy.* The legislature seeks to encourage both the reduction of the amount and type of material entering the solid waste stream and the reuse and recycling of materials. Solid waste represents discarded materials and energy resources, and it also represents an economic burden to the people of the state. The recycling of solid waste materials is one alternative for the conservation of material and energy resources, but it is also in the public interest to reduce the amount of materials requiring recycling or disposal."

[3] Minnesota is apparently the first State so to regulate milk containers. 289 N. W. 2d 79, 81, n. 6 (1979).

[4] Transcript of the Debate of the Minnesota House of Representatives on H. F. 45, p. 1 (Mar. 10, 1977), reprinted as Plaintiffs' Exhibit J.

[5] The principal empirical study cited in legislative debate, see, *e. g.,* Transcript of the Full Senate Floor Discussion on H. F. 45, p. 12 (May 20, 1977), reprinted as Plaintiffs' Exhibit J (statement of Sen. Luther), is Midwest Research Institute, Resource and Environmental Profile Analysis of Five Milk Container Systems, admitted into evidence as Plaintiffs' Exhibit I.

stop introduction of the plastic nonreturnable container before it became entrenched in the market. Opponents of the Act, also presenting empirical evidence, argued that the Act would not promote the goals asserted by the proponents, but would merely increase costs of retail milk products and prolong the use of ecologically undesirable paperboard milk cartons.

After the Act was passed, respondents filed suit in Minnesota District Court, seeking to enjoin its enforcement. The court conducted extensive evidentiary hearings into the Act's probable consequences, and found the evidence "in sharp conflict." App. A-25. Nevertheless, finding itself "as factfinder . . . obliged to weigh and evaluate this evidence," *ibid.*, the court resolved the evidentiary conflicts in favor of respondents, and concluded that the Act "will not succeed in effecting the Legislature's published policy goals . . . ." *Id.*, at A-21. The court further found that, contrary to the statement of purpose in § 1, the "actual basis" for the Act "was to promote the economic interests of certain segments of the local dairy and pulpwood industries at the expense of the economic interests of other segments of the dairy industry and the plastics industry." *Id.*, at A-19. The court therefore declared the Act "null, void, and unenforceable" and enjoined its enforcement, basing the judgment on substantive due process under the Fourteenth Amendment to the United States Constitution and Art. 1, § 7, of the Minnesota Constitution; equal protection under the Fourteenth Amendment; and prohibition of unreasonable burdens on interstate commerce under Art. I, § 8, of the United States Constitution. App. A-23.

The State appealed to the Supreme Court of Minnesota, which affirmed the District Court on the federal equal protection and due process grounds, without reaching the Commerce Clause or state-law issues. 289 N. W. 2d 79 (1979). Unlike the District Court, the State Supreme Court found that the purpose of the Act was "to promote the state in

terests of encouraging the reuse and recycling of materials and reducing the amount and type of material entering the solid waste stream," and acknowledged the legitimacy of this purpose. *Id.,* at 82. Nevertheless, relying on the District Court's findings of fact, the full record, and an independent review of documentary sources, the State Supreme Court held that "the evidence conclusively demonstrates that the discrimination against plastic nonrefillables is not rationally related to the Act's objectives." *Ibid.* We granted certiorari, 445 U. S. 949, and now reverse.

## II

The parties agree that the standard of review applicable to this case under the Equal Protection Clause is the familiar "rational basis" test. See *Vance* v. *Bradley,* 440 U. S. 93, 97 (1979); *New Orleans* v. *Dukes,* 427 U. S. 297, 303 (1976).[6] Moreover, they agree that the purposes of the Act

---

[6] JUSTICE STEVENS' dissenting opinion argues that the Minnesota Supreme Court when reviewing a challenge to a Minnesota statute on equal protection grounds is not bound by the limits applicable to federal courts, but may independently reach conclusions contrary to those of the legislature concerning legislative facts bearing on the wisdom or utility of the legislation. This argument, though novel, is without merit. A state court may, of course, apply a more stringent standard of review as a matter of state law under the State's equivalent to the Equal Protection or Due Process Clauses. *E. g., Baker* v. *City of Fairbanks,* 471 P. 2d 386, 401–402 (Alaska 1970); *Serrano* v. *Priest,* 18 Cal. 3d 728, 764–765, 557 P. 2d 929, 950–951 (1976), cert. denied, 432 U. S. 907 (1977); *State* v. *Kaluna,* 55 Haw. 361, 368–369, 520 P. 2d 51, 58–59 (1974); see Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv. L. Rev. 489 (1977). And as the dissent correctly notes, *post,* at 479–481, the States are free to allocate the lawmaking function to whatever branch of state government they may choose. *Uphaus* v. *Wyman,* 360 U. S. 72, 77 (1959); *Sweezy* v. *New Hampshire,* 354 U. S. 234, 256–257 (1957) (Frankfurter, J., concurring in result); *Dreyer* v. *Illinois,* 187 U. S. 71, 83–84 (1902). But when a state court reviews state legislation challenged as violative of the Fourteenth Amendment, it is not

cited by the legislature—promoting resource conservation, easing solid waste disposal problems, and conserving energy— are legitimate state purposes. Thus, the controversy in this

free to impose greater restrictions as a matter of federal constitutional law than this Court has imposed. *Oregon* v. *Hass*, 420 U S. 714, 719 (1975).

The standard of review under equal protection rationality analysis— without regard to which branch of the state government has made the legislative judgment—is governed by federal constitutional law, and a state court's application of that standard is fully reviewable in this Court on writ of certiorari. 28 U. S. C. § 1257 (3). JUSTICE STEVENS concedes the flaw in his argument when he admits that "a state court's decision invalidating state legislation on federal constitutional grounds may be reversed by this Court if the state court misinterpreted the relevant federal constitutional standard." *Post,* at 489. And contrary to his argument that today's judgment finds "no precedent in this Court's decisions," *post,* at 482, we have frequently reversed State Supreme Court decisions invalidating state statutes or local ordinances on the basis of equal protection analysis more stringent than that sanctioned by this Court. *E. g., Idaho Dept. of Employment* v. *Smith,* 434 U. S. 100 (1977); *Arlington County Board* v. *Richards,* 434 U. S. 5 (1977); *Richardson* v. *Ramirez,* 418 U. S. 24 (1974); *Lehnhausen* v. *Lake Shore Auto Parts Co.,* 410 U. S. 356 (1973). See also *North Dakota Pharmacy Board* v. *Snyder's Drug Stores, Inc.,* 414 U. S. 156 (1973); *Dean* v. *Gadsen Times Publishing Corp.,* 412 U. S. 543 (1973); *McDaniel* v. *Barresi,* 402 U. S. 39 (1971). Never have we suggested that our review of the judgments in such cases differs in any relevant respect because they were reached by state courts rather than federal courts.

Indeed, JUSTICE STEVENS has changed his own view. Previously he has stated that state-court decisions under the Fourteenth Amendment granting litigants "more protection than the Federal Constitution requires," are in error. *Idaho Dept. of Employment* v. *Smith, supra,* at 104 (STEVENS, J., dissenting in part). This is in agreement with the conclusion of one commentator:

"In reviewing state court resolutions of federal constitutional issues, the Supreme Court has not differentiated between those decisions which sustain and those which reject claims of federal constitutional right. In both instances, once having granted review, the Court has simply determined whether the state court's federal constitutional decision is 'correct,' meaning, in this context, whether it is the decision that the Supreme Court would independently reach." Sager, Fair Measure: The Legal Status of

case centers on the narrow issue whether the legislative classification between plastic and nonplastic nonreturnable milk containers is rationally related to achievement of the statutory purposes.[7]

## A

Respondents apparently have not challenged the *theoretical* connection between a ban on plastic nonreturnables and the purposes articulated by the legislature; instead, they have argued that there is no *empirical* connection between the two. They produced impressive supporting evidence at trial to prove that the probable consequences of the ban on plastic nonreturnable milk containers will be to deplete natural resources, exacerbate solid waste disposal problems, and waste energy, because consumers unable to purchase milk in plastic

---

Underenforced Constitutional Norms, 91 Harv. L. Rev. 1212, 1243 (1978) (footnote omitted).

Thus, JUSTICE STEVENS' argument in the dissenting opinion that today's treatment of the instant case is extraordinary and unprecedented, see *post*, at 482, and n. 7, is simply wrong.

[7] Respondents, citing the District Court's Finding of Fact No. 12, App. A–19, also assert that the actual purpose for the Act was illegitimate: to "isolate from interstate competition the interests of certain segments of the local dairy and pulpwood industries." Brief for Respondents 23. We accept the contrary holding of the Minnesota Supreme Court that the articulated purpose of the Act is its actual purpose. See 289 N. W. 2d, at 82. In equal protection analysis, this Court will assume that the objectives articulated by the legislature are actual purposes of the statute, unless an examination of the circumstances forces us to conclude that they "could not have been a goal of the legislation." See *Weinberger* v. *Wiesenfeld*, 420 U. S. 636, 648, n. 16 (1975). Here, a review of the legislative history supports the Minnesota Supreme Court's conclusion that the principal purposes of the Act were to promote conservation and ease solid waste disposal problems. The contrary evidence cited by respondents, see Brief for Respondents 29–31, is easily understood, in context, as economic defense of an Act genuinely proposed for environmental reasons. We will not invalidate a state statute under the Equal Protection Clause merely because some legislators sought to obtain votes for the measure on the basis of its beneficial side effects on state industry.

containers will turn to paperboard milk cartons, allegedly a more environmentally harmful product.

But States are not required to convince the courts of the correctness of their legislative judgments. Rather, "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Vance* v. *Bradley,* 440 U. S., at 111. See also *Day-Brite Lighting, Inc.* v. *Missouri,* 342 U. S. 421, 425 (1952); *Henderson Co.* v. *Thompson,* 300 U. S. 258, 264–265 (1937).

Although parties challenging legislation under the Equal Protection Clause may introduce evidence supporting their claim that it is irrational, *United States* v. *Carolene Products Co.,* 304 U. S. 144, 153–154 (1938),[8] they cannot prevail so long as "it is evident from all the considerations presented to [the legislature], and those of which we may take judicial notice, that the question is at least debatable." *Id.,* at 154. Where there was evidence before the legislature reasonably supporting the classification, litigants may not procure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken.

The District Court candidly admitted that the evidence was "in sharp conflict," App. A–25, but resolved the conflict in favor of respondents and struck down the statute. The Supreme Court of Minnesota, however, did not reverse on the basis of this patent violation of the principles governing rationality analysis under the Equal Protection Clause. Rather, the court analyzed the statute afresh under the Equal Protection Clause, and reached the conclusion that the statute is

---

[8] We express no view whether the District Court could have dismissed this case on the pleadings or granted summary judgment for the State on the basis of the legislative history, without hearing respondents' evidence. See *Vance* v. *Bradley,* 440 U. S. 93, 109–112 (1979); *Bayside Fish Flour Co.* v. *Gentry,* 297 U. S. 422 (1936).

constitutionally invalid. The State contends that in this analysis the court impermissibly substituted its judgment for that of the legislature. We turn now to that argument.

## B

The State identifies four reasons why the classification between plastic and nonplastic nonreturnables is rationally related to the articulated statutory purposes. If any one of the four substantiates the State's claim, we must reverse the Minnesota Supreme Court and sustain the Act.

First, the State argues that elimination of the popular plastic milk jug will encourage the use of environmentally superior containers. There is no serious doubt that the plastic containers consume energy resources and require solid waste disposal, nor that refillable bottles and plastic pouches are environmentally superior. Citing evidence that the plastic jug is the most popular, and the gallon paperboard carton the most cumbersome and least well regarded package in the industry, the State argues that the ban on plastic nonreturnables will buy time during which environmentally preferable alternatives may be further developed and promoted.

As Senator Spear argued during the Senate debate:

"[T]his bill is designed to prevent the beginning of another system of non-returnables that is going to be very, very difficult [to stop] once it begins. It is true that our alternative now is not a returnable system in terms of milk bottles. Hopefully we are eventually going to be able to move to that kind of a system, but we are never going to move to a returnable system so long as we allow another non-returnable system with all the investment and all of the vested interest that that is going to involve to begin." Transcript of the Full Senate Floor Discussion of H. F. 45, p. 6 (May 20, 1977), reprinted as Plaintiffs' Exhibit J.

Accord, *id.,* at 1–2 (statement of Sen. Luther).

The Minnesota Supreme Court dismissed this asserted state interest as "speculative and illusory." 289 N. W. 2d, at 86. The court expressed doubt that the Minnesota Legislature or Pollution Control Agency would take any further steps to promote environmentally sound milk packaging, and stated that there is no evidence that paperboard cartons will cease to be used in Minnesota. *Ibid.*

We find the State's approach fully supportable under our precedents. This Court has made clear that a legislature need not "strike at all evils at the same time or in the same way," *Semler* v. *Oregon State Board of Dental Examiners,* 294 U. S. 608, 610 (1935), and that a legislature "may implement [its] program step by step, . . . adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations." *New Orleans* v. *Dukes,* 427 U. S., at 303. See also *Katzenbach* v. *Morgan,* 384 U. S. 641, 657 (1966); *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 489 (1955); *Railway Express Agency, Inc.* v. *New York,* 336 U. S. 106, 110 (1949). The Equal Protection Clause does not deny the State of Minnesota the authority to ban one type of milk container conceded to cause environmental problems, merely because another type, already established in the market, is permitted to continue in use. Whether *in fact* the Act will promote more environmentally desirable milk packaging is not the question: the Equal Protection Clause is satisfied by our conclusion that the Minnesota Legislature *could rationally have decided* that its ban on plastic nonreturnable milk jugs might foster greater use of environmentally desirable alternatives.

Second, the State argues that its ban on plastic nonreturnable milk containers will reduce the economic dislocation foreseen from the movement toward greater use of environmentally superior containers. The State notes that plastic nonreturnables have only recently been introduced on a wide scale in Minnesota, and that, at the time the legislature was

considering the Act, many Minnesota dairies were preparing to invest large amounts of capital in plastic container production. As Representative Munger, chief sponsor of the bill in the House of Representatives, explained:

> "Minnesota's dairy market is on the verge of making a major change over from essentially a paperboard container system to a system of primarily single use, throwaway plastic bottles. The major dairies in our state have ordered the blow-mold equipment to manufacture in plant the non-returnable plastic milk bottle. Members of the House, I feel now is an ideal time for this legislation when only one dairy in our state is firmly established in manufacturing and marketing the throwaway plastic milk bottle." Transcript of the Debate of the Minnesota House of Representatives on H. F. 45, p. 2 (Mar. 10, 1977), reprinted as Plaintiffs' Exhibit J.

See also Transcript of the Full Senate Floor Discussion on H. F. 45, p. 6 (May 20, 1977), reprinted as Plaintiffs' Exhibit J (statement of Sen. Milton); *id.*, at 9 (statement of Sen. Schaaf); *id.*, at 10–11 (statement of Sen. Perpich).

Moreover, the State explains, to ban both the plastic and the paperboard nonreturnable milk container at once would cause an enormous disruption in the milk industry because few dairies are now able to package their products in refillable bottles or plastic pouches. Thus, by banning the plastic container while continuing to permit the paperboard container, the State was able to prevent the industry from becoming reliant on the new container, while avoiding severe economic dislocation.

The Minnesota Supreme Court did not directly address this justification, but we find it supported by our precedents as well. In *New Orleans* v. *Dukes, supra,* we upheld a city regulation banning pushcart food vendors, but exempting from the ban two vendors who had operated in the city for over eight years. Noting that the "city could reasonably decide

that newer businesses were less likely to have built up substantial reliance interests in continued operation," we held that the city "could rationally choose initially to eliminate vendors of more recent vintage." *Id.,* at 305. Accord, *United States* v. *Maryland Savings-Share Ins. Corp.,* 400 U. S. 4, 6 (1970). This case is not significantly different. The state legislature concluded that nonreturnable, nonrefillable milk containers pose environmental hazards, and decided to ban the most recent entry into the field. The fact that the legislature in effect "grandfathered" paperboard containers, at least temporarily, does not make the Act's ban on plastic nonreturnables arbitrary or irrational.

Third, the State argues that the Act will help to conserve energy. It points out that plastic milk jugs are made from plastic resin, an oil and natural gas derivative, whereas paperboard milk cartons are primarily composed of pulpwood, which is a renewable resource. This point was stressed by the Act's proponents in the legislature. Senator Luther commented: "We have been through an energy crisis in Minnesota. We know what it is like to go without and what we are looking at here is a total blatant waste of petroleum and natural gas . . . ." Transcript of the Full Senate Floor Discussion on H. F. 45, p. 12 (May 20, 1977), reprinted as Plaintiffs' Exhibit J. Representative Munger said in a similar vein:

> "A sweep to the plastic throwaway bottle in the gallon size container alone would use enough additional natural gas and petroleum to heat 3,100 homes each year in Minnesota when compared to a refillable system and 1,400 compared to the present paperboard system. Plastic containers are made from a non-renewable resource while the paperboard is made from Minnesota's forest products." Transcript of the Debate of the Minnesota House of Representatives on H. F. 45, p. 2 (Mar. 10, 1977), reprinted as Plaintiffs' Exhibit J.

The Minnesota Supreme Court held, in effect, that the legislature misunderstood the facts. The court admitted that the results of a reliable study [9] support the legislature's conclusion that less energy is consumed in the production of paperboard containers than in the production of plastic nonreturnables, but, after crediting the contrary testimony of respondents' expert witness and altering certain factual assumptions,[10] the court concluded that "production of plastic nonrefillables requires less energy than production of paper containers." 289 N. W. 2d, at 85.

The Minnesota Supreme Court may be correct that the Act is not a sensible means of conserving energy. But we reiterate that "it is up to legislatures, not courts, to decide on the wisdom and utility of legislation." *Ferguson* v. *Skrupa,* 372 U. S. 726, 729 (1963). Since in view of the evidence before the legislature, the question clearly is "at least debatable," *United States* v. *Carolene Products Co.,* 304 U. S., at 154, the Minnesota Supreme Court erred in substituting its judgment for that of the legislature.

Fourth, the State argues that the Act will ease the State's solid waste disposal problem. Most solid consumer wastes in Minnesota are disposed of in landfills. A reputable study before the Minnesota Legislature indicated that plastic milk jugs occupy a greater volume in landfills than other nonreturnable milk containers.[11] This was one of the legislature's major concerns. For example, in introducing the bill to the House of Representatives, Representative Munger asked rhe-

---

[9] See n. 5, *supra.*

[10] The court adopted the higher of two possible measurements of energy consumption from paperboard production, apparently because the lower figure contemplated the use of waste products, such as sawdust, for energy production. In addition, the court substituted a lower measurement of the energy consumption from plastic nonreturnable production for that used in the study. 289 N. W. 2d, at 84–85.

[11] This was the conclusion of the Midwest Research Institute study, see n. 5, *supra.* Brief for Petitioner 21.

torically: "Why do we need this legislation?" Part of his answer to the query was that "the plastic non-refillable containers will increase the problems of solid waste in our state." Transcript of the Debate of the Minnesota House of Representatives on H. F. 45, p. 1 (Mar. 10, 1977), reprinted as Plaintiffs' Exhibit J.

The Minnesota Supreme Court found that plastic milk jugs in fact take up less space in landfills and present fewer solid waste disposal problems than do paperboard containers. 289 N. W. 2d, at 82–85. But its ruling on this point must be rejected for the same reason we rejected its ruling concerning energy conservation: it is not the function of the courts to substitute their evaluation of legislative facts for that of the legislature.

We therefore conclude that the ban on plastic nonreturnable milk containers bears a rational relation to the State's objectives, and must be sustained under the Equal Protection Clause.[12]

### III

The District Court also held that the Minnesota statute is unconstitutional under the Commerce Clause [13] because it imposes an unreasonable burden on interstate commerce.[14] We cannot agree.

---

[12] The District Court also held that the Act violated substantive due process, and was apparently affirmed by the State Supreme Court on this ground. Conclusion of Law No. 1, App. A–23; 289 N. W. 2d, at 87, n. 20. From our conclusion under equal protection, however, it follows *a fortiori* that the Act does not violate the Fourteenth Amendment's Due Process Clause. See *Exxon Corp.* v. *Governor of Maryland,* 437 U. S. 117, 124–125 (1978); *Ferguson* v. *Skrupa,* 372 U. S. 726 (1963).

[13] "The Congress shall have Power . . . To regulate Commerce . . . among the several States . . . ." U. S. Const., Art. I, § 8, cl. 3.

[14] The Minnesota Supreme Court did not reach the Commerce Clause issue. 289 N. W. 2d, at 87, n. 20. The parties and *amici* have fully briefed and argued the question, and because of the obvious factual connection between the rationality analysis under the Equal Protection Clause and the balancing of interests under the Commerce Clause, we will reach

When legislating in areas of legitimate local concern, such as environmental protection and resource conservation, States are nonetheless limited by the Commerce Clause. See *Lewis* v. *BT Investment Managers, Inc.,* 447 U. S. 27, 36 (1980); *Hunt* v. *Washington Apple Advertising Comm'n,* 432 U. S. 333, 350 (1977); *Southern Pacific Co.* v. *Arizona ex rel. Sullivan,* 325 U. S. 761, 767 (1945). If a state law purporting to promote environmental purposes is in reality "simple economic protectionism," we have applied a "virtually *per se* rule of invalidity." *Philadelphia* v. *New Jersey,* 437 U. S. 617, 624 (1978).[15] Even if a statute regulates "evenhandedly," and imposes only "incidental" burdens on interstate commerce, the courts must nevertheless strike it down if "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137, 142 (1970). Moreover, "the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Ibid.*

Minnesota's statute does not effect "simple protectionism," but "regulates evenhandedly" by prohibiting all milk retailers from selling their products in plastic, nonreturnable milk containers, without regard to whether the milk, the contain-

---

and decide the question. See *New York City Transit Authority* v. *Beazer,* 440 U. S. 568, 583, n. 24 (1979).

[15] A court may find that a state law constitutes "economic protectionism" on proof either of discriminatory effect, see *Philadelphia* v. *New Jersey,* or of discriminatory purpose, see *Hunt* v. *Washington Apple Advertising Comm'n,* 432 U. S., at 352–353. Respondents advance a "discriminatory purpose" argument, relying on a finding by the District Court that the Act's "actual basis was to promote the economic interests of certain segments of the local dairy and pulpwood industries at the expense of the economic interests of other segments of the dairy industry and the plastics industry." App. A–19. We have already considered and rejected this argument in the equal protection context, see n. 7, *supra,* and do so in this context as well.

ers, or the sellers are from outside the State. This statute is therefore unlike statutes discriminating against interstate commerce, which we have consistently struck down. *E. g., Lewis* v. *BT Investment Managers, Inc., supra* (Florida statutory scheme prohibiting investment advisory services by bank holding companies with principal offices out of the State); *Hughes* v. *Oklahoma,* 441 U. S. 322 (1979) (Oklahoma statute prohibiting the export of natural minnows from the State); *Philadelphia* v. *New Jersey, supra* (New Jersey statute prohibiting importation of solid and liquid wastes into the State); *Hunt* v. *Washington Apple Advertising Comm'n, supra* (North Carolina statute imposing additional costs on Washington, but not on North Carolina, apple shippers).

Since the statute does not discriminate between interstate and intrastate commerce, the controlling question is whether the incidental burden imposed on interstate commerce by the Minnesota Act is "clearly excessive in relation to the putative local benefits." *Pike* v. *Bruce Church, Inc., supra,* at 142. We conclude that it is not.

The burden imposed on interstate commerce by the statute is relatively minor. Milk products may continue to move freely across the Minnesota border, and since most dairies package their products in more than one type of containers,[16] the inconvenience of having to conform to different packaging requirements in Minnesota and the surrounding States should be slight. See *Pacific States Box & Basket Co.* v. *White,* 296 U. S. 176, 184 (1935). Within Minnesota, business will presumably shift from manufacturers of plastic nonreturnable containers to producers of paperboard cartons, refillable bot-

---

[16] Respondent Wells Dairy, an Iowa firm, sells 60% of its milk in plastic nonreturnable containers, and the remainder in other types of packages, including paperboard cartons. Tr. 419, 426, 439. The Chairman of the Board of respondent Marigold Foods, Inc., a Minnesota dairy, admitted at trial that his firm would continue to sell milk in plastic nonreturnable containers in other States, despite the passage of the Act. *Id.,* at 474.

tles, and plastic pouches, but there is no reason to suspect that the gainers will be Minnesota firms, or the losers out-of-state firms. Indeed, two of the three dairies, the sole milk retailer, and the sole milk container producer challenging the statute in this litigation are Minnesota firms.[17]

Pulpwood producers are the only Minnesota industry likely to benefit significantly from the Act at the expense of out-of-state firms. Respondents point out that plastic resin, the raw material used for making plastic nonreturnable milk jugs, is produced entirely by non-Minnesota firms, while pulpwood, used for making paperboard, is a major Minnesota product. Nevertheless, it is clear that respondents exaggerate the degree of burden on out-of-state interests, both because plastics will continue to be used in the production of plastic pouches, plastic returnable bottles, and paperboard itself, and because out-of-state pulpwood producers will presumably absorb some of the business generated by the Act.

Even granting that the out-of-state plastics industry is burdened relatively more heavily than the Minnesota pulpwood industry, we find that this burden is not "clearly excessive" in light of the substantial state interest in promoting conservation of energy and other natural resources and easing solid waste disposal problems, which we have already reviewed in the context of equal protection analysis. See *supra,* at 465–470. We find these local benefits ample to support Minnesota's decision under the Commerce Clause. Moreover, we find that no approach with "a lesser impact on interstate activities," *Pike* v. *Bruce Church, Inc., supra,* at 142, is available. Respondents have suggested several alternative statutory schemes, but these alternatives are either more burdensome on commerce than the Act (as, for example, banning all nonreturnables) or less likely to be effective (as, for ex-

---

[17] See n. 1, *supra.* The existence of major in-state interests adversely affected by the Act is a powerful safeguard against legislative abuse. *South Carolina State Highway Dept.* v. *Barnwell Bros., Inc.,* 303 U. S. 177, 187 (1938).

ample, providing incentives for recycling). See Brief for Respondents 32–33.

In *Exxon Corp.* v. *Governor of Maryland*, 437 U. S. 117 (1978), we upheld a Maryland statute barring producers and refiners of petroleum products—all of which were out-of-state businesses—from retailing gasoline in the State. We stressed that the Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Id.*, at 127–128. A nondiscriminatory regulation serving substantial state purposes is not invalid simply because it causes some business to shift from a predominantly out-of-state industry to a predominantly in-state industry. Only if the burden on interstate commerce clearly outweighs the State's legitimate purposes does such a regulation violate the Commerce Clause.

The judgment of the Minnesota Supreme Court is

*Reversed.*

JUSTICE REHNQUIST took no part in the consideration or decision of this case.

JUSTICE POWELL, concurring in part and dissenting in part.

The Minnesota statute at issue bans the retail sale of milk in plastic nonreturnable, nonrefillable containers, but permits such sale in paperboard milk cartons. Respondents challenged the validity of the statute under both the Equal Protection and Commerce Clauses. The Minnesota District Court agreed with respondents on both grounds. The Supreme Court of Minnesota also agreed that the statute violated the Equal Protection Clause, but found it unnecessary to reach the Commerce Clause issue.

This Court today reverses the Supreme Court of Minnesota, finding no merit in either of the alleged grounds of invalidity. I concur in the view that the statute survives equal protection challenge, and therefore join the judgment of reversal on this

ground. I also agree with most of Parts I and II of the Court's opinion.

I would not, however, reach the Commerce Clause issue, but would remand it for consideration by the Supreme Court of Minnesota. The District Court expressly found:

> "12. Despite the purported policy statement published by the legislature as its basis for enacting Chapter 268, the actual basis was to promote the economic interests of certain segments of the local dairy and pulpwood industries at the expense of the economic interests of other segments of the dairy industry and the plastics industry." App. to Pet. for Cert. A–24.

At a subsequent point in its opinion, and in even more explicit language, the District Court reiterated its finding that the purpose of the statute related to interstate commerce.[1] These findings were highly relevant to the question whether the statute discriminated against interstate commerce. See *Philadelphia* v. *New Jersey*, 437 U. S. 617, 624 (1978) ("The crucial inquiry . . . must be directed to determining whether [the statute] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental"). Indeed, the trial court's findings normally would require us to conclude that the Minnesota Legislature was engaging in such discrimination, as they were not rejected by the Minnesota Supreme Court. That court simply invalidated the statute on equal protection grounds, and had no reason to consider the claim of discrimination against interstate commerce.

---

[1] Finding 23 of the District Court was as follows:

"23. Despite the purported policy reasons published by the Legislature as bases for enacting Chapter 268, *actual bases were to isolate from interstate competition* the interests of certain segments of the local dairy and pulpwood industries. The economic welfare of such local interests can be promoted without the remedies prescribed in Chapter 268." App. to Pet. for Cert. A–27 (emphasis added).

The Minnesota Supreme Court did accept the *avowed* legislative purpose of the statute. It stated: "The Act is intended to promote the policies stated in Minn. St. 116F.01; therefore it is intended to promote the state interests of encouraging the reuse and recycling of materials and reducing the amount and type of material entering the solid waste stream." 289 N. W. 2d 79, 82 (1979). The Court today reads this statement as an implied rejection of the trial court's specific finding that the "actual [purpose] was to promote the economic interests of certain segments of the local dairy and pulpwood industries at the expense of the economic interests" of the nonresident dairy and plastics industry. In my view, however, the Minnesota Supreme Court was merely assuming that the statute was intended to promote its stated purposes. It was entirely appropriate for that court to accept, for purposes of equal protection analysis, the purpose expressed in the statute. See *ante,* at 463, n. 7. When the court did so, however, there is no reason to conclude that it intended to express or imply any view on any issue it did not consider. In drawing its conclusions, the court included no discussion whatever of the Commerce Clause issue and, certainly, no rejection of the trial court's express and repeated findings concerning the legislature's actual purpose.[2]

I conclude therefore that this Court has no basis for *inferring* a rejection of the quite specific factfindings by the trial court. The Court's decision today, holding that Chapter 268 does not violate the Commerce Clause, is flatly contrary

---

[2] Commerce Clause analysis differs from analysis under the "rational basis" test. Under the Commerce Clause, a court is empowered to disregard a legislature's statement of purpose if it considers it a pretext. See *Dean Milk Co.* v. *Madison,* 340 U. S. 349, 354 (1951) ("A different view, that the ordinance is valid simply because it professes to be a health measure, would mean that the Commerce Clause of itself imposes no limitations on state action other than those laid down by the Due Process Clause, save for the rare instance where a state artlessly discloses an avowed purpose to discriminate against interstate goods").

to the only relevant specific findings of fact. Although we are not *barred* from reaching the Commerce Clause issue, in doing so we also act without the benefit of a decision by the highest court of Minnesota on the question. In these circumstances, it is both unnecessary, and in my opinion inappropriate, for this Court to decide the Commerce Clause issue. See, *e. g., FTC* v. *Anheuser-Busch, Inc.*, 363 U. S. 536, 542 (1960); *United States* v. *Ballard*, 322 U. S. 78, 88 (1944). Because no reason has been offered for a departure from our customary restraint, I would remand the case with instructions to consider specifically whether the statute discriminated impermissibly against interstate commerce.

JUSTICE STEVENS, dissenting.

While the Court in this case seems to do nothing more than apply well-established equal protection and Commerce Clause principles to a particular state statute, in reality its reversal of the Minnesota Supreme Court is based upon a newly discovered principle of federal constitutional law. According to this principle, which is applied but not explained by the majority, the Federal Constitution defines not only the relationship between Congress and the federal courts, but also the relationship between state legislatures and state courts. Because I can find no support for this novel constitutional doctrine in either the language of the Federal Constitution or the prior decisions of this Court, I respectfully dissent.

I

The keystone of the Court's equal protection analysis is its pronouncement that "it is not the function of the courts to substitute their evaluation of legislative facts for that of the legislature." *Ante*, at 470.[1] If the pronouncement concerned

---

[1] See also *ante*, at 464, where the Court states that "States are not required to convince the courts of the correctness of their legislative judgments"; and *ibid.*, where the Court states that "litigants may not pro-

the function of *federal* courts, it would be amply supported by reason and precedent. For federal tribunals are courts of limited jurisdiction, whose powers are confined by the Federal Constitution, by statute, and by the decisions of this Court. It is not surprising, therefore, that the Court's pronouncement is supported by citation only to precedents dealing with the function that a *federal* court may properly perform when it is reviewing the constitutionality of a law enacted by Congress or by a state legislature.[2]

_____

cure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken."

[2] The majority cites *Vance* v. *Bradley,* 440 U S. 93 (1979); *Ferguson* v. *Skrupa,* 372 U. S. 726 (1963); *Day-Brite Lighting, Inc.* v. *Missouri,* 342 U. S. 421 (1952); *United States* v. *Carolene Products Co.,* 304 U. S. 144 (1938); and *Henderson Co.* v. *Thompson,* 300 U. S. 258 (1937), in support of its conclusion that it is not the function of the Minnesota courts to re-evaluate facts considered by the Minnesota Legislature. See *ante,* at 464, 469. However, even a cursory examination of these cases reveals that they provide no support for the Court's decision in this case.

In four of the cited cases, the Court reviewed the actions of lower federal, not state, courts. These cases thus shed no light upon the role a state court properly may play in reviewing actions of the state legislature. In *Vance* v. *Bradley* and *United States* v. *Carolene Products,* Federal District Courts had invalidated federal statutes on federal constitutional grounds. In both cases, this Court reversed because the District Courts had exceeded the scope of their powers by re-evaluating the factual bases for the congressional enactments. See *Vance, supra,* at 111–112; *Carolene Products, supra,* at 152, 154. In *Ferguson* v. *Skrupa,* a Federal District Court had invalidated a Kansas statute on federal constitutional grounds. This Court reversed, finding that the District Court had exceeded constitutional limitations by substituting its judgment for that of the Kansas Legislature. See 372 U. S., at 729–731. The Court also indicated in *Ferguson* that its own power to supervise the actions of state legislatures is narrowly circumscribed. *Id.,* at 730–731. Finally, in *Henderson Co.* v. *Thompson,* a Federal District Court had sustained a Texas statute in the face of a constitutional challenge. In affirming that decision, the Court simply observed that "[t]he needs of conservation are to be determined by the Legislature." 300 U. S., at 264.

In only one of the cases cited by the majority did the Court review a state-court judgment. In *Day-Brite Lighting, Inc.* v. *Missouri,* a

But what is the source—if indeed there be one—of this Court's power to make the majestic announcement that it is not the function of a *state court* to substitute its evaluation of legislative facts for that of a state legislature? I should have thought the allocation of functions within the structure of a state government would be a matter for the State to determine. I know of nothing in the Federal Constitution that prohibits a State from giving lawmaking power to its courts.[3]

---

Missouri statute was challenged on due process, equal protection, and Contract Clause theories. The Missouri Supreme Court had upheld the statute, and this Court affirmed. In the course of its opinion, the Court stated that *it* was not free to re-evaluate the legislative judgment or act as "a superlegislature." 342 U. S., at 423, 425. The Court did not comment at all upon the extent of the Missouri Supreme Court's authority to supervise the activities of the Missouri Legislature. Nothing in the *Day-Brite Lighting* opinion can be construed as the source of the Court's newly found power to determine for the States which lawmaking powers may be allocated to their courts and which to their legislatures.

[3] Responding to an argument that the lawmaking power of the Virginia Legislature had been improperly assigned to another arm of the State's government, Justice Cardozo, writing for the Court in *Highland Farms Dairy, Inc.* v. *Agnew*, 300 U. S. 608, 612–613 (1937), stated:

"The Constitution of the United States in the circumstances here exhibited has no voice upon the subject. The statute challenged as invalid is one adopted by a state. This removes objections that might be worthy of consideration if we were dealing with an act of Congress. How power shall be distributed by a state among its governmental organs is commonly, if not always, a question for the state itself. Nothing in the distribution here attempted supplies the basis for an exception. The statute is not a denial of a republican form of government. Constitution, Art. IV, § 4. Even if it were, the enforcement of that guarantee, according to the settled doctrine, is for Congress, not the courts. *Pacific States Telephone Co.* v. *Oregon*, 223 U. S. 118; *Davis* v. *Hildebrant*, 241 U. S. 565; *Ohio ex rel. Bryant* v. *Akron Park District*, 281 U. S. 74, 79, 80. Cases such as *Panama Refining Co.* v. *Ryan*, 293 U. S. 388, and *Schechter Poultry Corp.* v. *United States*, 295 U. S. 495, cited by appellants, are quite beside the point. What was in controversy there was the distribution of power between President and Congress, or between Congress and administrative officers or commissions, a controversy affecting the structure of the na-

480

Nor is there anything in the Federal Constitution that prevents a state court from reviewing factual determinations made by a state legislature or any other state agency.[4] If a state statute expressly authorized a state tribunal to sit as a Council of Revision with full power to modify or to amend

tional government as established by the provisions of the national constitution.

"So far as the objection to delegation is founded on the Constitution of Virginia, it is answered by a decision of the highest court of the state. In *Reynolds* v. *Milk Commission*, 163 Va. 957; 179 S. E. 507, the Supreme Court of Appeals passed upon the validity of the statute now in question. . . . A judgment by the highest court of a state as to the meaning and effect of its own constitution is decisive and controlling everywhere." See also *Dreyer* v. *Illinois*, 187 U. S. 71, 83–84 (1902); *Sweezy* v. *New Hampshire*, 354 U. S. 234, 256–257 (1957) (Frankfurter, J., concurring in result).

[4] In *Ferguson* v. *Skrupa*, *supra*, the Court indicated that the Federal Constitution does prevent the federal courts from reviewing factual determinations made by a state legislature. In rejecting the substantive due process cases of an earlier era, the Court stated:

"Under the system of government created by our Constitution, it is up to legislatures, not courts, to decide on the wisdom and utility of legislation." 372 U. S., at 729.

The Court went on to explain this constitutional limitation:

"We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws. . . . Legislative bodies have broad scope to experiment with economic problems, and this Court does not sit to 'subject the State to an intolerable supervision hostile to the basic principles of our Government and wholly beyond the protection which the general clause of the Fourteenth Amendment was intended to secure.'" *Id.*, at 730 (footnote omitted).

The Court's conclusion in *Ferguson* that the Constitution imposes limitations upon the power of the federal courts to review legislative judgments was clearly correct and was consistent with the structure of the Federal Constitution and "the system of government created" therein. The Constitution defines the relationship among the coordinate branches of the Federal Government and prescribes for each branch certain limited powers. The Federal Constitution, however, is silent with respect to the powers of the coordinate branches of state governments and the relationship among those branches.

the work product of its legislature, that statute would not violate any federal rule of which I am aware. The functions that a state court shall perform within the structure of state government are unquestionably matters of state law.

One of the few propositions that this Court has respected with unqualified consistency—until today—is the rule that a federal court is bound to respect the interpretation of state law announced by the highest judicial tribunal in a State.[5] In this case, the Minnesota Supreme Court has held that the state trial court acted properly when it reviewed the factual basis for the state legislation, and implicitly the Minnesota Supreme Court also has held that its own review of the legislative record was proper. Moreover, it also has determined as a matter of state law how it properly should resolve conflicts in the evidence presented to the state legislature, as supplemented by the additional evidence presented to the trial court in this case.[6] In my opinion, the factual conclu-

---

[5] Although this proposition is so well established as to require no citation of authority, abundant authority is readily available. See, e. g., North Carolina v. Butler, 441 U. S. 369, 376, n. 7 (1979); Ward v. Illinois, 431 U. S. 767, 772 (1977); Eastlake v. Forest City Enterprises, Inc., 426 U. S. 668, 674, n. 9 (1976); Hortonville Joint School District No. 1 v. Hortonville Education Assn., 426 U. S. 482, 488 (1976); Mullaney v. Wilbur, 421 U. S. 684, 691 (1975); Memorial Hospital v. Maricopa County, 415 U. S. 250, 256 (1974); Wardius v. Oregon, 412 U. S. 470, 477 (1973); Groppi v. Wisconsin, 400 U. S. 505, 507 (1971).

[6] In its memorandum in this case, the state trial court initially observed that it was not free to "substitute its judgment for that of the legislature as to the wisdom or desirability of the act." App. A–24. With respect to the facts considered by the legislature, however, the trial court found that "as fact-finder, [it was] obliged to weigh and evaluate this evidence, much of which was in sharp conflict." Id., at A–25.

In its opinion affirming the trial court's decision, the Minnesota Supreme Court took a similar view of the function to be performed by the Minnesota courts when reviewing Minnesota legislation:

"We are aware of the deference that is accorded to the legislature when the present type of statute is analyzed on equal protection grounds. Nevertheless, our inquiry into the constitutional propriety of the present

sions drawn by the Minnesota courts concerning the deliberations of the Minnesota Legislature are entitled to just as much deference as if they had been drafted by the state legislature itself and incorporated in a preamble to the state statute. The State of Minnesota has told us in unambiguous language that this statute is not rationally related to any environmental objective; it seems to me to be a matter of indifference, for purposes of applying the federal Equal Protection Clause, whether that message to us from the State of Minnesota is conveyed by the State Supreme Court, or by the state legislature itself.

I find it extraordinary that this federal tribunal feels free to conduct its own *de novo* review of a state legislative record in search of a rational basis that the highest court of the State has expressly rejected. There is no precedent in this Court's decisions for such federal oversight of a State's lawmaking process.[7] Of course, if a federal trial court had reviewed the

---

classification separating paper containers from plastic nonrefillables is dependent upon facts. Based upon the relevant findings of fact by the trial court, supported by the record, and upon our own independent review of documentary sources, we believe the evidence conclusively demonstrates that the discrimination against plastic nonrefillables is not rationally related to the Act's objectives." 289 N. W. 2d 79, 82 (1979).

[7] In its footnote 6, *ante,* at 461–463, the Court takes issue with my suggestion that its action in this case is unprecedented by citing four cases in which the Court reversed State Supreme Court decisions invalidating provisions of state law on federal equal protection grounds. See *Idaho Dept. of Employment* v. *Smith,* 434 U. S. 100 (1977) *(per curiam); Arlington County Board* v. *Richards,* 434 U. S. 5 (1977) *(per curiam); Richardson* v. *Ramirez,* 418 U. S. 24 (1974); *Lehnhausen* v. *Lake Shore Auto Parts,* 410 U. S. 356 (1973). In each of those cases, however, this Court concluded that the state court had applied an incorrect legal standard; in none did this Court reassess the factual predicate for the state-court decision.

In *Idaho Dept. of Employment,* the Idaho Supreme Court had invalidated a statutory classification, not because it generally failed to further legitimate state goals, but rather because the court had found that the classification was imperfect since some members of the class denied

factual basis for a state law, conflicts in the evidence would have to be resolved in favor of the State.[8]  But when a state court has conducted the review, it is not our business to dis-

unemployment benefits were in fact as available for full-time employment as members of the class entitled to benefits under the Idaho statute.  See *Smith* v. *Department of Employment,* 98 Idaho 43, 43–44, 557 P. 2d 637, 637–638 (1976), citing *Kerr* v. *Department of Employment,* 97 Idaho 385, 545 P. 2d 473 (1976).  This Court did not disagree with the Idaho court's finding that the classification was imperfect, but merely held that this imperfection was legally insufficient to invalidate the statute under the Equal Protection Clause. 434 U. S., at 101–102.  In *Arlington County Board* v. *Richards,* the Virginia Supreme Court had recognized the rational-basis test as the appropriate equal protection standard, but then had proceeded to apply a more stringent standard to the municipal ordinance at issue.  The court had expressly noted that the municipal ordinance "may relieve the [parking] problems" to which it was directed. However, the court concluded that the means employed by the county to deal with these problems—a classification based upon residency—created an unconstitutional "invidious discrimination."  See *Arlington County Board* v. *Richards,* 217 Va. 645, 651, 231 S. E. 2d 231, 235 (1977). This Court reversed, rejecting the conclusion that the ordinance's residency classification resulted in an invidious discrimination.  434 U. S., at 7.  In *Richardson* v. *Ramirez,* a voting rights case, the California Supreme Court was reversed, not because it had re-examined the factual determinations of the California Legislature, but because this Court found that the statutory discrimination at issue was expressly authorized by § 2 of the Fourteenth Amendment. 418 U. S., at 41–56.  Finally, in *Lake Shore Auto Parts* v. *Lehnhausen,* the Illinois Supreme Court had held, in essence, that a classification used in determining liability for a property tax must, as a constitutional matter, be based upon the nature of the property at issue, and not upon the corporate or noncorporate character of the property's owner  See *Lake Shore Auto Parts* v. *Korzen,* 49 Ill. 2d 137, 149–151, 273 N. E. 2d 592, 598–599 (1971)  This Court rejected this principle, finding it inconsistent with prior decisions clearly establishing that distinctions between individuals and corporations in tax legislation violated no constitutional rights. 410 U. S., at 359–365.

As the majority observes, the Court in each of these cases reversed the state-court decisions because the state courts had applied an equal protection standard more stringent than that sanctioned by this Court. Quite frankly, in my opinion it would have been sound judicial policy

agree with the state tribunal's evaluation of the State's own lawmaking process. Even if the state court should tell us that a state statute has a meaning that we believe the state

in all four of those cases to allow the state courts to accord even greater protection within their respective jurisdictions than the Federal Constitution commands. See my dissent in *Idaho Dept. of Employment, supra,* at 104. But what is especially relevant here is the fact that in none of those cases had the state courts found, after a full evidentiary hearing, that the factual predicate for the state law at issue was simply not true. The Minnesota courts in this case made such a finding after the development of an extensive record. The Minnesota courts then applied the correct federal legal standard to the facts revealed by this record and concluded that the statutory classification was not rationally related to a legitimate state purpose. As I read the cases cited by the majority, they are simply inapposite in this case. My own research has uncovered no instance in which the Court has reversed the decision of the highest court of a State, as it does in this case, because the state court exceeded some federal constitutional limitation upon its power to review the factual determinations of the state legislature. The Court has never before, to my knowledge, undertaken to define, as a matter of federal law, the appropriate relationship between a state court and a state legislature.

[8] In most of the cases in which the Court has indicated that courts may not substitute their judgment for that of the legislature, the Court was reviewing decisions of the lower federal courts. See, *e. g., New Orleans* v. *Dukes,* 427 U. S. 297, 303 (1976) (*per curiam*); *Hughes* v. *Alexandria Scrap Corp.,* 426 U. S. 794, 812 (1976); *United States* v. *Maryland Savings-Share Ins. Corp.,* 400 U. S. 4, 6 (1970) (*per curiam*); *Firemen* v. *Chicago, R. I. & P. R. Co.,* 393 U. S. 129, 136, 138–139 (1968); *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 487–488 (1955); *Secretary of Agriculture* v. *Central Roig Refining Co.,* 338 U. S. 604, 618–619 (1950); *Daniel* v. *Family Insurance Co.,* 336 U. S 220, 224 (1949); *Clark* v. *Paul Gray, Inc.,* 306 U. S. 583, 594 (1939); *South Carolina State Highway Dept.* v. *Barnwell Bros., Inc.,* 303 U. S. 177, 190–191 (1938); *Bayside Fish Flour Co.* v. *Gentry,* 297 U. S. 422, 427–428, 430 (1936); *Borden's Farm Products Co.* v. *Ten Eyck,* 297 U. S. 251, 263 (1936); *Sproles* v. *Binford,* 286 U. S. 374, 388–389 (1932); *Standard Oil Co.* v. *Marysville,* 279 U. S. 582, 584, 586 (1929); *Hebe Co.* v. *Shaw,* 248 U. S. 297, 303 (1919). In those instances in which the Court was reviewing state-court decisions, its statements with respect to the limited role of the judiciary in reviewing state

legislature plainly did not intend, we are not free to take our own view of the matter.[9]

Once it is recognized that this Court may not review the question of state law presented by the Minnesota courts' decision to re-evaluate the evidence presented to the legislature, the result we must reach in this case is apparent. Because the factual conclusions drawn by the Minnesota courts are clearly supported by the record,[10] the only federal issue that this case presents is whether a discriminatory statute that is

---

legislation clearly concerned its own authority to act as a "superlegislature," not the authority of a state court to do so where permitted by state law. See, *e. g., Exxon Corp.* v. *Governor of Maryland,* 437 U. S. 117, 124 (1978); *Railway Express Agency, Inc.* v. *New York,* 336 U. S. 106, 109 (1949); *Olsen* v. *Nebraska,* 313 U. S. 236, 246 (1941); *Zahn* v. *Board of Public Works,* 274 U. S. 325, 328 (1927); *Cusack Co.* v. *Chicago,* 242 U. S. 526, 531 (1917); *Hadacheck* v. *Los Angeles,* 239 U. S 394, 413–414 (1915); *Price* v. *Illinois,* 238 U. S. 446, 452–453 (1915); *Laurel Hill Cemetery* v. *San Francisco,* 216 U. S. 358, 365 (1910).

[9] This Court will defer to the interpretation of state law announced by the highest court of a State even where a more reasonable interpretation is apparent, see, *e. g., O'Brien* v. *Skinner,* 414 U. S. 524, 531 (1974), a contrary construction might save a state statute from constitutional invalidity, see, *e. g., Landmark Communications, Inc.* v. *Virginia,* 435 U. S. 829, 837, n. 9 (1978), or it appears that the state court has attributed an unusually inflexible command to its legislature, see, *e. g., Kingsley Pictures Corp.* v *Regents,* 360 U. S. 684, 688–689 (1959).

[10] As the majority notes, the evidence considered by the Minnesota courts was conflicting, *ante,* at 460, 464, 469, and the respondents "produced impressive supporting evidence at trial" indicating that the decision of the Minnesota Legislature was factually unsound. *Ante,* at 463. In light of this record, this Court clearly cannot reverse the concurrent factual findings of two state courts.

Moreover, since there is no significant difference between plastic containers and paper containers in terms of environmental impact, and since no one contends that the Minnesota statute will reduce the consumption of dairy products, it is not difficult to understand the state judges' skeptical scrutiny of a legislative ban on the use of one kind of container without imposing any present or future restriction whatsoever on the use of the other.

admittedly irrational violates the Equal Protection Clause of the Fourteenth Amendment. The Court implicitly acknowledges that the Minnesota Supreme Court applied the proper rule of federal law when it answered that question.[11] Whatever we may think about the environmental consequences of this discriminatory law, it follows inexorably that it is our duty as federal judges to affirm the judgment of the Minnesota Supreme Court.

## II

In light of my conclusion that the Minnesota Supreme Court's equal protection decision must be affirmed, I need not address the Commerce Clause question resolved by the majority. *Ante*, at 470–474. Nonetheless, I believe that the majority's treatment of that question compels two observations.

First, in my opinion the Court errs in undertaking to decide the Commerce Clause question at all. The state trial court addressed the question and found that the statute was designed by the Minnesota Legislature to promote the economic interests of the local dairy and pulpwood industries at the expense of competing economic groups.[12] On appeal, the

---

[11] It is true that the Court carefully avoids an express acknowledgment that the Minnesota Supreme Court applied the correct legal standard. Not one word in the Court's opinion, however, suggests that the Court has any disagreement with the state court's understanding of the proper federal rule.

[12] The trial court made the following findings of fact:

"12. Despite the purported policy statement published by the Legislature as its basis for enacting Chapter 268, the actual basis was to promote the economic interests of certain segments of the local dairy and pulpwood industries at the expense of the economic interests of other segments of the dairy industry and the plastics industry.

.         .         .         .         .

"23. Despite the purported policy reasons published by the Legislature as bases for enacting Chapter 268, actual bases were to isolate from interstate competition the interests of certain segments of the local dairy and pulpwood industries. The economic welfare of such local interests can be

Minnesota Supreme Court expressly declined to consider this aspect of the trial court's decision, and accordingly made no comment at all upon the merits of the Commerce Clause question. 289 N. W. 2d 79, 87, n. 20 (1979). Generally, when reviewing state-court decisions, this Court will not decide questions which the highest court of a State has properly declined to address. The majority offers no persuasive explanation for its unusual action in this case.[13] In the absence

---

promoted without the remedies prescribed in Chapter 268." App. A–19, A–22.

These findings were repeated in the memorandum filed by the trial court in this case:

"The relevant legislative history of Chapter 268 support [*sic*] a conclusion that the real basis for it was to serve certain economic interests (paper, pulpwood, and some dairies) at the expense of other competing economic groups (plastic and certain dairies) by prohibiting the plastic milk bottle." *Id.*, at A–24.

[13] According to the majority, its decision to address the Commerce Clause question is justified "because of the obvious factual connection between the rationality analysis under the Equal Protection Clause and the balancing of interests under the Commerce Clause." *Ante*, at 470, n. 14. The majority cites *New York City Transit Authority* v. *Beazer*, 440 U. S. 568 (1979), in support of this rationale. This justification is inadequate, in my opinion, for two reasons.

First, in light of the trial court's factual finding that the Minnesota Legislature enacted the statute for protectionist, rather than environmental, reasons, see n. 12, *supra*, the Equal Protection Clause and Commerce Clause inquiries are not necessarily as similar as the Court suggests. As the majority acknowledges, if a state law which purports to promote environmental goals is actually protectionist in design, a virtually automatic rule of invalidity, not a balancing-of-interests test, is applied. See *ante*, at 471. See also *New Orleans* v. *Dukes*, 427 U. S., at 304, n. 5.

Second, in *Beazer* the Court reviewed the decision of a lower federal court, not a state supreme court. While this Court, in its discretion, may elect to deprive lower federal courts of the opportunity to decide particular statutory questions, it seems to me that respect for the Minnesota Supreme Court as the highest court of a sovereign State dictates that we not casually divest it of authority to decide a constitutional question on which it properly declined to comment when this case was first before it. Such deference is especially appropriate here because the Court's analysis of

of some substantial justification for this action, I would not deprive the Minnesota Supreme Court of the first opportunity to review this aspect of the decision of the Minnesota trial court.

Second, the Court's Commerce Clause analysis suffers from the same flaw as its equal protection analysis. The Court rejects the findings of the Minnesota trial court, not because they are clearly erroneous, but because the Court is of the view that the Minnesota courts are not authorized to exercise such a broad power of review over the Minnesota Legislature. See *ante,* at 471, n. 15. After rejecting the trial court's findings, the Court goes on to find that any burden the Minnesota statute may impose upon interstate commerce is not excessive in light of the substantial state interests furthered by the statute. *Ante,* at 473. However, the Minnesota Supreme Court expressly found that the statute is not rationally related to the substantial state interests identified by the majority.[14] Because I believe, as explained in Part I, *supra,* that the Court's intrusion upon the lawmaking process of the State of Minnesota is without constitutional sanction or precedential support, it is clear to me that the findings of the Minnesota Supreme Court must be respected by this Court. Accordingly, the essential predicate for the majority's conclusion that the "local benefits [are] ample to support Minnesota's decision under the Commerce Clause," *ante,* at 473, is absent.

## III

The majority properly observes that a state court, when applying the provisions of the Federal Constitution, may not

---

the Commerce Clause issue requires rejection of the state trial court's findings of fact.

[14] As noted in Part I, *supra,* the Court rejects the Minnesota Supreme Court's findings, not because they are without support in the record—they clearly are adequately supported, see n. 10, *supra*—but because it feels that the Minnesota Supreme Court was without authority to do anything other than endorse the factual conclusions of the Minnesota Legislature.

apply a constitutional standard more stringent than that announced in the relevant decisions of this Court. See *ante,* at 461–463, n. 6. It follows from this observation that a state court's decision invalidating state legislation on federal constitutional grounds may be reversed by this Court if the state court misinterpreted the relevant federal constitutional standard. In this case, however, the Minnesota Supreme Court applied the correct federal equal protection standard and properly declined to consider the Commerce Clause. The majority reverses this decision because it disagrees with the Minnesota courts' perception of their role in the State's lawmaking process, not because of any error in the application of federal law. In my opinion, this action is beyond the Court's authority. I therefore respectfully dissent.