**NEW YORK STATE ASSOCIATION OF CAREER SCHOOLS, et al., Plaintiffs,**

**v.**

**STATE EDUCATION DEPARTMENT OF THE STATE OF NEW YORK, et al., Defendants.**

**No. 90 Civ. 5560 (RWS).**

United States District Court,
S.D. New York.

Oct. 25, 1990.

As Amended Oct. 26, 1990.

Carl E. Person, New York City, for plaintiffs.

Lizette A. Cantres (Kathy A. Ahearn, Deborah A. Glasbrener, of counsel), Albany, N.Y., for defendants.

## OPINION

SWEET, District Judge.

Plaintiff New York State Association of Career Schools ("NYSACS") and certain schools which are members of the NYSACS have moved for a preliminary injunction pursuant to Rule 65, Federal Rules of Civil Procedure against the defendants State Education Department of the State of New York ("SED"), its Commissioner and certain of its officers and employees (collectively "SED"). Based upon the findings and conclusions set forth below, the motion is denied.

## PRIOR PROCEEDINGS

NYSACS filed the complaint in this action on September 24, 1990 alleging that the recently enacted amendments to Section 5001, *et seq.* of the New York State Education Law contained in Senate Bill 5817–E and Assembly Bill 7517–D (the "Amendments") violated certain of the amendments of the United States Constitution. By order to show cause, NYSACS sought a temporary restraining order on that date to bar the enforcement of the Amendments which by the terms of the legislation were to become effective on October 1, 1990. The restraint was denied and a schedule was set for the hearing of the application for preliminary injunction.

Argument and evidence was received on September 10, 11 and 17, 1990 and final argument was heard on September 24 at which time the matter was considered submitted.

## THE FACTS

NYSACS and its members are non-degree granting proprietary schools offering to teach "any subject by any plan or method including written, visual, or audio-visual methods", § 5001, Education Law (the "Schools"). The Schools are today approximately 350 in number, having ranged in number from 250 in 1979 to 400 in 1989. The average school receives gross tuition revenues of $700,000 per year but 30% of the Schools are larger than the average and those schools, a number of which are part of national chains, account for 70% of the total revenues received by the Schools. Certain of the larger schools have tuition receipts in the millions, the largest chain having total tuition receipts of $50 million. The rate of closing among the Schools was seven times greater in 1989 than it was in 1985.

The students in the Schools under certain circumstances are eligible for federal aid by way of student loans in an average amount of $3000 and so-called Pell grants in an average of $3000 plus some certain expenses. The average tuition for the Schools throughout the state is $6000. The federal loans are guaranteed by the State through the Higher Education Services Corporation ("HESC"). The majority of the students at the Schools are minorities,

between the ages of 18–27, unemployed and without high school diplomas.

A number of the Schools adopted a practice of hiring recruiters to locate students to participate in the courses offered in the Schools with remuneration based upon the per person enrollment without regard to the qualifications of the student or the completion of the course of study. Such practices coupled with the aid programs led to abuses and in certain instances criminal prosecutions. *See e.g., United States v. Grundhoefer*, 916 F.2d 788 (2d Cir.1990) (defendants convicted of defrauding the government and students out of guaranteed student loan checks). Default on the federal loans results in barring the defaulting student from any further financial aid, and the State is called upon to perform on its guarantee.

The default rates for the Schools was approximately 70% of the total amount of defaulted loans for 1988, some $75,184,225 out of $122,947,459. Students attending the Schools take out 22% of the federally guaranteed student loans but amount to 44% of the defaults. The default rate for the Schools in New York City is 25.6% and that of the two year Community Colleges of the City University of the City of New York ("CUNY") is 20.9%. Nonetheless, out of 43,884 defaulted guaranteed student loans in 1988, 31,254 of them were taken out by students attending non-degree granting proprietary schools. Students of the Schools taking courses less than 600 hours are required to pay 100% of the tuition costs.

There is competition between the Schools for students and between the Schools and degree-granting institutions which offer continuing education courses and publicly financed Boards of Cooperative Education Services ("BOCES") which offer vocational and training courses and schools offering courses where the tuition is less than $300. No evidence was presented as to the extent of this competition though examples of roughly comparable course offerings were presented. Many of the vocational courses offered by the degree-granting institutions are in the nature of continuing education in a particular field. Prior experience or training and a high school diploma are on occasion an entry requirement. In general the students enrolling for courses offered by the degree granting institutions are better educated, more affluent and older. The Schools' primary objective is to provide education to permit entry level employment.

Degree granting institutions are subject to regulation under Parts 52, 53, 54, and 145 of the Regulations of the Commissioner of SED. These institutions are mainly non-profit (some small number of degree-granting proprietary colleges do exist, approximately 29) and are subject to the peculiarities of academic discipline with respect to course approval, tenure and the requirements for credits. Their governance is customarily responsible to and selected by a constituency other than the management of the institution. Changes in operation are more deliberate and slower than those of the Schools which are subject only to the restraints imposed by customary commercial practice. Degree-granting institutions are reviewed before the authority to issue credits is granted, in the course of which finances, teacher qualifications, faculty, courses, resources, administration and plant are considered by the state authorities. These institutions are subject to periodic review and must submit audited financials to SED.

BOCES courses offered in the daytime must be approved by SED as other public school courses are approved. Certain of the BOCES evening or vocational courses are regulated by legislation outside the Education Law but others are not. The BOCES governance is that of the school districts making up the BOCES which are thereby publicly financed.

Since 1949 New York State (the "State") has regulated private schools. Since 1979 there has been a regulatory scheme in place affecting the Schools. Sections 5001 and 5002 and the regulations of SED prior to the amendments at issue here provided that all advertising by the Schools required pre-approval, a licensing process for sales agents which required submission to the SED and consequent delays, performance

bonds for the Schools before approval of their licensing, bonding for each of the sales agents, as well as course approvals and the licensing requirements.

The Amendments were the product of the usual legislative process as indicated by the bill jacket which was introduced into evidence. Certain of the Schools and presumably NYSACS made presentations in the course of this process. Certain new provisions were added to the Education Law:

1. Requirement of audited financial statements;

2. Requirement of refund provisions in enrollment agreements similar to those in effect for degree granting installations;

3. Criminalization of every intentional violation of the statute, as amended;

4. 9/10ths of 1% assessment on the Schools' gross tuition revenues (before refunds) to pay the expenses of the Bureau of Proprietary Schools Supervision ("BOPS") 7/10ths of 1% and to finance the tuition Reimbursement Fund (2/10ths of 1%) and the expenses of regulation;

5. Surprise visits at Schools during which the Schools' operation is observed unless visitation is refused, an action which might, or might not, result in a disciplinary hearing with attendant due process rights. No warnings are given in the course of these visits.

6. Restrictions on sales compensation by limiting per head commissions for recruiters to 1% of the recruiters base salary and making the commission contingent on the students retention, and the licensing of sales agents.

In addition NYSACS has cited the following provisions which relate only to the Schools and not to degree-granting institutions or BOCES.

1. All provisions authorizing fines, penalties, refunds, other sanctions, hearings or other civil proceedings against proprietary schools or any of their officers, directors, shareholders or owners;

2. Requirement of certified statistical reports;

3. Required disclosures for licensure;

4. Restrictions on transfer or sale of license, business or assets;

5. Restrictions on discontinuance of School's business;

6. Criteria for admission of students;

7. Licensing of teachers;

8. Requirement that agent must be salaried employee;

9. Required disclosures to students;

10. Tuition reimbursement fund; and

11. Imposition of tuition trust account on Schools.

New regulations issued by the Commissioner on September 14, 1990 which follow are also the subject of the complaint of NYSACS.

1. The Schools can no longer inform prospective students how much the average person earns in a specified field according to published statistics, but advertise how much the School's graduates are earning "includ[ing] the number and percent of graduates employed at the advertised salary level listed by year of graduation."

2. The School must obtain prior approval from defendants to offer any scholarships or grants.

3. The school must terminate (and give refunds to) students who are absent 20% of the course from inception to end of the current marking period; the old regulations said 20% of the entire course.

4. All courses offered at no cost to the student shall comply with all requirements of the Commissioner's regulations, Part 126.

5. "Any course ... containing a skill component involving the use of machines shall maintain a student-to-machine ratio of one-to-one, unless otherwise approved by the Commissioner.

6. Schools require Commissioner's approval upon "sale or transfer of a school license, ... renovation or alternation of a School's facilities or reorganization of instructional space or equipment.

7. Teacher license applications shall be submitted 30 days prior to employment and shall be acted upon within 45 days.

8. No individual may be a director of more than one school without the Commissioner's approval.

9. A temporary teacher is required to take a 30–clock–hour or three-semester-credit-hour course in methods of teaching.

10. All teachers with a provisional license shall submit an application for the next level of licensure at least 30 days prior to the expiration of the existing permit or license.

11. Trade associations may lose any approval they may have to conduct teacher training courses if the courses are not given the approved number of times.

12. Only a licensed teacher may substitute for another teacher and no more than 10% of a course may be taught by an inappropriately licensed substitute teacher.

13. School's application or registration fee may not exceed $50.

14. Detailed, specific refund provisions for the Schools are provided at PX 7, pp. 21–26.

15. Schools failing to demonstrate "adequacy of resources ... in the judgment of the Commissioner" may lose their license.

16. Schools making initial application for licensing must submit a statement indicating the location and type of all bank accounts and a projected operating statement for a 12–month period.

17. Each School shall prepare a catalog describing all State, Federal and School financial aid programs; the procedures for form preparation; student eligibility requirements; a statement of the rights and responsibilities of students receiving financial aid; criteria for continued eligibility; criteria for determining that a student is in good standing and maintaining satisfactory progress and how to reestablish eligibility for financial aid; the means by which payment of awards will be made; the terms and expected schedules of repayment; a description of the complaint procedures pursuant to section 5003 of the Education Law.

18. The Commissioner shall act upon an application for school license within 120 days.

19. Any transfer of 10% or more of the School's assets shall be deemed a transfer of such School's license and require the Commissioner's prior approval.

20. The Commissioner may require a school to obtain an audit of any statistical reports submitted by the School if the Commissioner determines that the reports are inaccurate.

21. No School may discontinue operations unless written notice of intent to do so and a plan for safe keeping of records is provided to the Commissioner at least 30 days prior to such discontinuance.

22. All School sales agents with a temporary agent's license shall attend a 3–hour course conducted by defendants at a time and place determined by defendants.

23. A student is entitled to a 100% refund from the tuition reimbursement fund if the student has submitted a complaint and the School either (i) violated any law; (ii) used an unlicensed teacher as little as 1 day in one course; (iii) used a substitute teacher contrary to the Commissioner's regulations; (iv) used an unlicensed agent to procure the enrollment; (v) received an improper claim from an agent; (vi) was terminated for other than just cause; (vii)

was not given the program approved by the Commissioner; or (viii) there was any other violation which caused the student to enroll in the school.

Since 1987, the number of student complaints received by SED concerning student loans, recruiting, educational quality, equipment availability, refund problems, school closings and teaching practices have increased threefold.

## A. *Standards for Preliminary Injunction*

In the Second Circuit, upon a request for a preliminary injunction, a court should examine the following factors:

> (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979).

## B. *No Irreparable Harm*

■ An injunction may issue only if the moving party can establish that it will suffer irreparable injury absent injunctive relief. NYSACS claims that the irreparable injury suffered here is the threat of being put out of business because of the increased regulatory costs and burdens contained in the new statute, the threatened loss of critical employees because of wage restraints, the loss of tuition income because of more stringent refund provisions and the cost of audited financial statements, and the threat of criminal prosecution. Also, NYSACS claims an irreparable loss to the public and the proprietary schools of the First Amendment right to freedom of speech and related freedom of choice of educational opportunities. Neither the alleged financial nor the constitutional injuries support a finding of irreparable harm.

### 1. Financial Loss does not Constitute Irreparable Harm

■ This circuit recognizes neither an irreparable harm that may be adequately redressed by money damages nor one that is purely conjectural. *KMV Int'l v. Chase Manhattan Bank, N.A.,* 606 F.2d 10, 14–15 (2d Cir.1979). *See also Citibank, N.A. v. Singer Co.,* 684 F.Supp. 382 (S.D.N.Y.1988) (citing same and noting no imminent injury). Although NYSACS raises the specter of financial loss to put forth an irreparable injury, NYSACS loss is purely speculative at this stage. No loss has been sustained by NYSACS and there is no imminent or guaranteed loss at which to point. NYSACS merely contends that the regulations will cost them if they violate those regulations or are at risk for violating those regulations. Indeed, SED argues that the regulations will actually save NYSACS money when implemented. Even if NYSACS could demonstrate financial loss, that loss, alone, does not warrant a finding of irreparable harm.

### 2. Loss of Constitutional Rights Would Constitute Irreparable Harm

■ NYSACS also asserts a violation of constitutional rights, namely loss of Due Process and the loss of a First Amendment right to educational freedom. Although the loss of constitutional rights would constitute an irreparable injury, *see Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976) (loss of First Amendment freedoms "unquestionably constitutes irreparable injury"); *see also Teachers Ass'n of the Japanese Educational Institute v. Japanese Educational Institute,* 724 F.Supp. 188, 192–93 (S.D.N.Y.1989) (loss of right to speak at meetings constituted irreparable harm), as discussed below, NYSACS has not demonstrated any such loss of constitutional rights that would warrant a finding of irreparable harm.

Accordingly, NYSACS has not demonstrated irreparable harm and no preliminary injunction will issue.

C. *Likelihood of Success on the Merits*

■ To prevail on a preliminary injunction motion, NYSACS must demonstrate that they are reasonably certain to succeed on the merits. *Jackson Dairy, Inc.*, 596 F.2d at 72. NYSACS has failed to carry this burden.

1. There is no First Amendment Violation

■ NYSACS has equated, erroneously, regulation of schools with regulation of speech. Although schools can be a warehouse or market for the dissemination of ideas, the regulation of schools does not *per se* constitute a regulation of speech. Indeed, the vast majority of the regulations the SED seeks to impose through the statute has nothing to do with the content of anything expressed in the schools.[1]

■ The sole possible exception to this general observation would be the regulation of the curriculum programs to be offered by the schools. SED, however, only regulates curriculum to the extent that it prohibits New York Education Law § 5001 schools from offering courses of the type licensed to § 5002 schools (generally business type courses). It is a neutral regulation and is unrelated to any suppression or promotion of ideas or view points.

■ Although facial challenges of a licensing or regulatory scheme are generally disfavored, they may be raised in a First Amendment context "where the licensing scheme vests unbridled discretion in the decisionmaker and where the regulation is challenged as overbroad." *FW/PBS, Inc. d/b/a Paris Adult Bookstore, II v. City of Dallas*, —— U.S. ——, 110 S.Ct. 596, 603, 107 L.Ed.2d 603 (1990) (citing *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 798 & n. 15, 104 S.Ct. 2118, 2125 & n. 15, 80 L.Ed.2d 772 (1984) (where scheme creates risk of delay such that every application of the statute creates an impermissible risk of idea suppression)). A licensing scheme has the potential to permit suppression of constitutionally protected speech where there are inadequate procedural safeguards to ensure prompt issuance of the license. *Id.*

■ Here, the thrust of NYSACS' complaint is not that there are inadequate procedural safeguards to ensure the prompt issuance of a license or that the risk of delay in every case will equal a suppression of ideas, but rather that there are multiple regulations governing the licensing of NYSACS. SED makes clear that first-time applicants for a school "should expect the process to take as long as six months although many applications are processed in less time." NYSACS has not contended that this licensing procedure is dilatory or that there exists no procedural method to ensure the prompt issuance of licenses. Instead, NYSACS takes issue with the regulations themselves[2] and that the proprietary schools are being regulated whereas other schools are not. Accordingly, the thrust of NYSACS argument is that New York schools are being treated different-

---

**1.** For example, NYSACS argues that the right to withdraw the license for one of any number of violations of the statute would cause the schools to close and thus the First Amendment rights of the institutions, the teachers and the students are implicated. Similarly, NYSACS contends that the prohibition against compensating a sales representative except as limited by the statute is likewise an impermissible burden on protected speech because it is not narrowly tailored to meet the state's legitimate concerns, that the statute imposes constitutionally forbidden prior restraints on the speech rights of all members of the academic community because the statute prevents teachers from teaching forbidden courses, the schools from offering them, and the students from receiving them unless all licenses and bonds and license fees are in order for the school, school director, instructors, courses, and sales agents. Furthermore, NYSACS contends that the criminalization of noncompliance "underlines the manifest unconstitutionality of these statutory amendments." None of these regulations remotely implicate First Amendment values.

**2.** For example, NYSACS states that schools are required to "apply for and obtain in advance a series of licenses, permits and approvals as to each step of their First Amendment businesses, from the licensing of the school director, the licensing of each sales representative, the licensing of each instructor ... the catalog, the course content, the school itself, the fire, health, buildings, sanitation department approvals, and enrollment agreement approvals."

ly—an equal protection, not a First Amendment argument.

### 2. There is No Equal Protection Violation

The thrust of NYSACS' argument and the case presented is that NYSACS schools are subject to regulations to which other schools (competing non-degree adult vocational programs of other 2–year and 4–year colleges and universities in New York, be they proprietary or not) are not subjected and thus NYSACS schools are hampered in their ability to attract students for courses at their schools, in their profit-making activities, and in their general conduct of affairs. NYSACS, however, has not established an equal protection violation.

■ It is undisputed that the state, in its exercise of police power may regulate private schools. *See Pierce v. Society of Sisters,* 268 U.S. 510, 534, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 402, 43 S.Ct. 625, 627–8, 67 L.Ed. 1042 (1923); The state legislature may classify schools differently and its discretion in so doing is broad. *In the Matter of Dorn "HH" v. Lawrence "II",* 31 N.Y.2d 154, 335 N.Y.S.2d 274, 276, 286 N.E.2d 717, 719 (N.Y.Ct.App.1972). Indeed the legislature's classification will not be disturbed if any state of facts reasonably can be conceived to sustain the classification, or even if the classification is fairly debatable. *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1980). It is even irrelevant whether the classification will *in fact* promote the Legislature's intended purpose. *See id.* All that is required is that the classification be not palpably arbitrary or in other words, that the Legislature could have decided rationally that the classification would likely further the underlying goals of the regulation. 449 U.S. at 466, 101 S.Ct. at 725 (equal protection clause satisfied where reason proffered for classification at least debatable).

■ That unequal treatment should result from the classification and the subsequent regulatory scheme is of no import where a classification has been adopted rationally. *See Dandridge v. Williams,* 397 U.S. 471, 486–87, 90 S.Ct. 1153, 1162–63, 25 L.Ed.2d 491 (1970). Finally, our review of the classification must presume that the Legislature acted within constitutional limits, upon full knowledge of the facts, and with the purpose of promoting the interest of the people as a whole in creating the challenged classification. *Clover Leaf Creamery Co.,* 456 U.S. at 469, 101 S.Ct. at 726.

■ Among the explanations SED has proffered for the classification complained of by NYSACS are the long and substantial history of proprietary schools of student abuses, closure rates, loan default rates, and program deficiencies such as a lack of equipment and teachers. Additionally, the differing structures of the proprietary schools and the institutions to which they compare themselves—including the not-for-profit and for-profit distinctions, the absence of an internal board of trustees (appointed by the governor with the advice of senate), the absence of a charter and the degree-granting authority from the Regents conditioned upon a lengthy application process to which the other schools are subjected (including audited financial statements, curricula, lists of books and equipment descriptions) could also support the classification. Similar rationales for differing regulations have been tendered in the past by the State and accepted by the courts. *See e.g., Barry v. Barchi,* 443 U.S. 55, 67–68, 99 S.Ct. 2642, 2650–51, 61 L.Ed.2d 365 (1979) (harness racing vs. thoroughbred racing classification); *Katz v. Shapiro,* 62 A.D.2d 231, 405 N.Y.S.2d 315 (3d Dep't 1978) (classification of private proprietary homes for adults compared to non-profit facilities where all other differences insignificant upheld).

■ The evidence adduced during the hearing indicated that the distinctions between the default rates of NYSACS and the other schools could be, on occasion, slim. For example, the average default rate of NYSACS hovers around 25.6%, while at CUNY it is only slightly better with a rate of 20.9%. Nonetheless, one exception does not prove the classification

arbitrary, nor does it invalidate the other reasons set forth by SED. NYSACS simply has not demonstrated that the multiple problems that plague the proprietary schools also plague the other schools and that similar programs in each type of school should be regulated similarly when the schools are admittedly different.

Although the classification may not be the most artfully created work to emerge from Albany or the best classification that could have been employed, it is, at minimum, a rational classification and thus it is not for this court to seek to relegislate or better tailor the means already legislated to the legitimate goals the State seeks to achieve. Accordingly, the injunction will not issue on an equal protection ground.

### 3. There is no Preemption Concern

 NYSACS argues that the new statute imposes a .009 tax on the gross tuition of the Schools, including any moneys which the schools must refund to the lending banks or the direct-paying students. The competing schools receive the same amount of federal financial aid without such a tax. NYSACS reasons that this tax against the Schools conflicts with federal financial aid legislation and is thus unconstitutional. NYSACS, however, fails to demonstrate how the regulatory tuition recovery fund tax conflicts with federal law. The statute requires the Schools to bear the regulatory cost from their gross tuition receipts. It does not require this tax to come from federal financial aid (even if that should be the primary source of the schools' tuition revenues) and there is no showing that this de minimis tax assessed for monitoring activities in any way conflicts with the scheme of federal financial aid regulation. The tax is neither a violation of the First Amendment, nor the Due

Process or Equal Protection Clauses of the Fourteenth Amendment.

### 4. There is No Sherman Act Violation or Due Process Violation

 NYSACS contends that the cap of 1% base annual salary per student placed upon the size of commissions that schools may pay to recruiters and the complicated mandatory refund scheme prohibiting the schools from charging students the full amount sought by the schools in exchange for their education services constitute illegal restraints of trade. However, the statute neither limits the amount of compensation a school may pay any of its employees, nor the amount of tuition a school can collect, it merely limits the manner in which recruiters may be compensated and the manner in which refunds must be provided for regulatory violations. Accordingly, the regulations do not constitute a "price-fixing" scheme nor a wage ceiling that would amount to an illegal restraint of trade or a due process violation.[3]

### 5. There is No Fourth Amendment Violation

 NYSACS also contends that SED's surprise warrantless visits are an infringement of NYSACS' Fourth Amendment rights against unreasonable search and seizure. This argument is without merit because the legislation clearly provides for the unscheduled visits to be conducted unobtrusively, only during school hours, and only with permission of the schools to access the premises or files. If SED is denied access they leave the premises. Although the denial of access may trigger disciplinary proceedings, absent consent, the premises cannot be searched and no Fourth Amendment right is abridged.[4]

---

**3.** Even if the statute were to be considered state price control regulation it is neither "arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt" as would be required to find a due process violation. *See Pennell v. City of San Jose*, 485 U.S. 1, 11, 108 S.Ct. 849, 857, 99 L.Ed.2d 1 (1988) (citing *Permian Basin Area Rate Cases*, 390 U.S. 747, 769–77, 88 S.Ct. 1344, 1361–65, 20 L.Ed.2d 312 (1968) (quoting *Nebbia v. New York*, 291

U.S. 502, 539, 54 S.Ct. 505, 517, 78 L.Ed. 940 (1934)).

**4.** Similarly, NYSACS' argument that the Schools' Fifth Amendment rights are abridged by SED's failure to issue Miranda warnings upon SED's surprise visits is frivolous. NYSACS cannot cite any premise, case, or principle in law requiring the reading of Miranda rights

## BALANCE OF HARDSHIPS

For an injunction to issue the moving party must demonstrate that the balance of hardships tips decidedly in its favor. *Jackson Dairy, Inc.*, 596 F.2d at 72. Should the statute go into effect, NY-SACS maintains the following hardships will ensue: restrictions on the amount which can be paid to school sales personnel, restrictions upon whether any of the bonus compensation can be paid at all, restrictions upon when the allowable, limited compensation must be paid, a .9% tax on the gross receipts of the school, the increase in the amount of refunds the school has to pay to students who withdraw prior to completion of the program; and the criminalization of each failure to comply with the myriad rules which apply to each student.

SED's hardships, should the injunction issue, would include the firing of the entire staff of SED's Bureau of Proprietary School Supervision (the "Bureau") because the statute establishes a revenue account which is the sole funding source of the Bureau. Not only will the employees of the Bureau lose their current jobs, the students who presently are protected by the regulatory functions of the Bureau would risk exposure to the very violations or practices the statute seeks to regulate.

Although neither party's hardships would be calculable on the evidence presented at the hearing, given the risk to the students the statute is designed to protect and the certain dismantling of the Bureau, it cannot be said that the speculation of additional school closings and increased compliance that the balance of hardships decidedly weighs more heavily on NY-SACS.

## CONCLUSION

For the reasons set forth above, NY-SACS' motion for a preliminary injunction is denied.

It is so ordered.

before a surprise visit conducted only upon the

School's consent to access the grounds/files.