# CIRCUIT COURT OF ACCOMACK COUNTY

Mark Miles et al.

v.

Virginia Marine
Resources Commission

December 28, 2000

Case No. (Chancery) 00CH005

By Judge Glen A. Tyler

The Court must decide in this case whether the Virginia Marine Resources Commission (VMRC or Commission) has unfairly reduced the number of peeler pots that a peeler crab fisherman may use from 400 pots to 300 pots. The appellants (Petitioners) allege that the VMRC's regulation of the blue crab fishery has, by such reduction, created a burden upon the peeler crab segment of the fishery without an equitable sharing of the burden by the hard crab segment of the blue crab fishery. They argue that the VMRC has, by piecemeal regulation in 4 VAC 20-270-50, Virginia Administrative Code, violated the provisions of an enabling statute, Va. Code Ann. § 28.2-203 (1997 Repl. Vol.), and that this Court should vacate the offending amendment of the regulation and remand the matter to the VMRC for a more even handed sharing of the burden by all of the blue crab fishery.

The respondent argues that the amendment of its regulation, reducing the number of permitted peeler pots, is reasonable because it is in keeping with the Commission's established Blue Crab Fishery Management Plan and alleviates an inequitable advantage gained by peeler potters in recent years in the blue crab fishery.

Because there may be those who will read this Opinion who are unfamiliar with the subject, it is appropriate to explain that which is well

known to all Chesapeake Bay watermen and to most people who live on the Eastern Shore, mainland or islands.

A mature male Atlantic blue crab is called a "jimmy." A mature female is a "sook" and an immature female is a "she-crab" or "lady crab." When a she-crab sheds her shell (external skeleton) for the last time, out of many times in her life, she becomes a sook. A blue crab grows by shedding its bony shell, which is called moulting, immediately after which it is very soft and has increased in size by approximately one-third. This very soft stage lasts only about half a day, if the crab is in the water, and it gradually hardens and is fully hard again in approximately two or three days.

Male blue crabs mate with females immediately after the females shed their shells. Females are attracted to males for several days prior to their last moult. During the days prior to their last moulting, female crabs are developing a soft second skin underneath their shells, and they are called "peelers." An experienced waterman can identify peelers by examining their back fins, looking for a telltale pinkish fringe. The subject is fully explained for the layman by William W. Warner in his book, *Beautiful Swimmers* (1976).

There are various devices and methods for catching blue crabs. Among the devices are crab pots, which are basket-like devices used as traps (not to be confused with "crab traps" which are devices different from pots). The pot is usually made of galvanized or plastic-coated wire mesh, which the uninitiated landman would laughably call chicken wire. The mesh size is as to certain types of pots regulated by law. Va. Code Ann. §§ 28.2-701, 28.2-705 (2000 Cum. Supp.). A pot is approximately 24 inches wide and 20 inches deep with openings for crabs to enter and from which they cannot escape.

The Code of Virginia provides definitions as follows:

> "Crab pot" means a device made of wire or thread net used to catch crabs.
>
> "Peeler crab" [means] . . . a crab that has a soft shell fully developed under the hard shell, or a crab on which there is a pink or white line or rim on the edge of that part of the back fin next to the outer section of this fin.
>
> "Peeler pot" means a wire mesh pot baited with only live adult male (jimmy) blue crabs.[1]

---

[1] Without going into unnecessary detail, suffice it to note that one is not necessarily required to actually use a jimmy as bait in order to fish for crabs with a peeler pot.

Va. Code Ann. § 28.2-700 (1997 Repl. Vol.).

The record in this case consists of a very large volume of documents. They are primarily the minutes of the meetings of the VMRC, together with exhibits, charts, public hearing records, and scientific reports. Rather than filling this Opinion with a plethora of footnotes, the record will be referred to generally and identified more specifically by the context.

At least as early as 1994, the minutes of the Commission reveal that total licensed peeler crab pots should be reduced in number in order to conserve crabs and thus promote the economic well-being of the blue crab fishery. There was some discussion then about the matter being an actual emergency because of overfishing specifically by peeler potters. The Commission concluded that an emergency did not then exist but that crabs were in decline. Therefore, the Commission commenced a comprehensive study of the crab industry with an eye towards correcting shortages in the supply of crabs. Significantly, discussion materials circulated to the Commission in 1994 showed that commercial crabbers then typically used 200 peeler pots per person, and such discussions included a suggested cap at that number.

Much scientific study and sampling ensued and empirical evidence was gathered from the commercial crab industry over a lengthy period of time.

At its meeting on October 25, 1994, the Commission adopted a blue crab management plan that included as a separate part, among seven parts, a specific limitation upon the number of peeler crab pots that would be permitted to a crab fisherman. The limitation was 200 until June 30 each year and 400 thereafter during the year, commencing in 1995. There was no separate adjustment of hard crab pots for fishermen in the hard crab segment of the crab fishery. There was no indication in the minutes that anyone thought this regulation of peeler pots was a "piecemeal" regulation or one aimed unfairly at a sub-category of crab fisherman.

At the end of the crab fishing season for the year 1995, the Virginia Institute of Marine Science (VIMS) reported to the VMRC on the status of the blue crab stock. Its summary conclusion was that effective management was needed and that management should be based upon a proportional harvest of the potential spawning stock by each segment of the fishery, thus reflecting their assessment of the previous year's study as well.

Then, on January 23, 1996, a very thorough scientific presentation was made to the Commission in addition to extensive information being received from members of the commercial industry. The Commission concluded by increasing its seven-point Blue Crab Fishery Management Plan to an eleven-point Plan, including, among other things, adjusting the limits on peeler pots to 300 in tributaries of the Bay and 500 in the mainstream of the Bay (later

adjusted to 400 in all waters). In addition, the Commission began a program of limiting entry by persons into the peeler pot fishery in the 1996 season as a further crab conservation measure and as a further protection of fishermen previously in the industry. This latter management action would soon prove to burden the Commission and its staff with a large increase in the number of persons applying for and receiving peeler pot licenses. The new applicants, the record discloses, intended to protect their options to preserve "potential" effort for the future rather than actually increase their immediate efforts at catching crabs.

The most significant revelations occurred in the Spring of 1999. There had been an eleven-point plan in place regulating the blue crab fishery, the seven-point plan from 1994 and four additional points from 1996, which included the limitation on peeler pots described above. It was revealed that the plan in some respects had not been as effective as it needed to be. The peeler crab harvest had substantially increased through actual fishing effort, and peeler pot licenses had substantially increased to alarming levels, increasing the potential effort. Licenses went from less than 500 in 1994 to over 900 in 1998. Licensees actually reporting harvests from peeler pots doubled in the years 1995 through 1998. No such relative results appeared in the hard crab pot fishery, though the total hard crab fishery is nearly ten times larger than the peeler crab fishery.

The Commission had thoroughly considered the matter and reconsidered it again after the Summer harvest of 1999, taking into consideration the findings of scientists and industry representatives at its meetings in October 1999 and November 1999. It is important to note from the record that the Commission intended to reduce effort in the peeler crab fishery, but primarily to reduce the potential effort. The average number of peeler pots actually fished per fisherman in 1999 was 267, and the goal, according to the record, was to reduce potential effort to a comparable level. At its meeting on November 16, 1999, the Commission amended its regulation 4 VAC 20-270-50 to permit a limit of 300 peeler crab pots per fisherman, down from 400 previously generally licensed. It is that act to which the appellants object.

Appellants focus upon the statute regulating the Commission. Va. Code Ann. § 28.2-203 (1997 Repl. Vol.). They contend that the Commission has violated the law. They ask the Court to remand the matter to the Commission with directions to more uniformly regulate all crab fishermen, not just those who fish peeler pots.

Note that the appellants assume that a crab fisherman is either a hard crab potter or a peeler crab potter. In fact, the same fisherman can be licensed to do either or both. But the Court will assume for the purposes of this case that

peeler crabbers could be considered separately. Indeed the record shows that some crab fishermen have only a peeler pot license and do not fish for hard crabs.

The regulation, 4 VAC 20-570-50, was amended by the VMRC on November 16, 1999, effective for the 2000 crabbing season. The regulation continues from year to year. The purpose of the regulation, according to its express terms, is the conservation of blue crabs generally. The offensive language is that "It shall be unlawful for any person to place, set or fish or attempt to place, set or fish more than 300 peeler crab pots." The language of the previous regulation was "A. From April 1 through June 30 it shall be unlawful for any person to place, set or fish more than 400 peeler crab pots per vessel. B. From July 1 through November 30 it shall be unlawful for any person to place, set or fish more than 400 peeler pots and it shall be unlawful for more than two peeler pot licensees to place, set or fish peeler pots from the same vessel." The nature of the offense is that a waterman could previously obtain a license to fish 400 peeler crab pots, and no such comparable and relative reduction in number of pots was imposed upon hard crab fishermen whose number of licensed pots are also generally limited. In other words, their fair share of crabs has, the peeler potters claim, been reduced.

Analysis reveals that the underlying question is whether the Commission may, consistent with the cited statute, regulate the crab fishery by focusing upon one stage in the life cycle of a crab and the method by which it is caught without, at the same time, focusing on and further regulating the catch in another stage, even though another stage in the crab's life, upon current information or further study, may also need further regulation. May the Commission take it one stage at a time or one step at a time or one part at a time, assuming the whole crab fishery is declining and vulnerable? The Court finds that it may do so. It is appropriate regulation of the device with which crabs in different stages in their life cycle are caught. When crabs at a certain stage in their life, when they are soon to shed their shells, are pursued because it is timely to do so for economic reasons, they are, nevertheless, crabs, and they are being pursued with a device that gathers them more efficiently because of the stage in their life. To focus on protecting a severely declining crab population by regulating the use of a device because that particular device is increasingly used and very efficient, even though only one in ten crabs is taken that way, is not inappropriate discrimination among crab fishermen. It is the large increase in the use or potential use of that particular device, the peeler crab pot, which is sought to be regulated. Because there has not been a large relative increase in the use of some other device for taking the other 9 out of 10 crabs caught by fishermen at other stages in their lives does

not mean that this device, the peeler pot, given the statistical experience of its increased use or potential use, should not be further regulated. Furthermore, the fact that the Commission may have attempted certain other regulatory schemes that backfired, causing increased potential peeler pot fishing, does not mean that the crab resource in this regard should continue unregulated when another probable solution is identified. Those who use a peeler pot unbaited or baited with a male crab, to catch a female peeler crab, are not in a separate group for purposes of discrimination. And crabbers who wish to use 400 as opposed to 300 of a certain type of crab pot are not discriminated against relative to crabbers using a different type of crab pot to catch a crab during a different stage in the crab's life.

The Court finds that there is substantial evidence in the VMRC record upon which it could reasonably conclude as it did. Furthermore, the appellants have not overcome the presumption of official regularity, experience, and competence of the Commission in the premises in which it acted according to law. Va. Code Ann. § 9-6.14:17 (1998 Repl. Vol.). The Commission may have come to the conclusions advanced by the appellants, but the conclusion the Commission chose was not unreasonable.

Regarding the Commission's obligation to prepare fishery management plans, such as its Blue Crab Fishery Management Plan, pursuant to Va. Code Ann. § 28.2-203.1 (1997 Repl. Vol.), there appears to be no case on point for guidance. However, the respondent's citation of *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 66 L. Ed. 2d 659, 101 S. Ct. 715 (1981), in its brief appears to be of service in informing the Court.

A reading of the whole BCFMP reveals that all crabs are managed as a "unit." And the plan does not discriminate among "user" groups where it appears that the statute permits necessary allocation or assignment of "fishing privileges among various user groups," especially when we see that conservation measures "shall take into account variations among, and contingencies in, fisheries, fishery resources and catches." Va. Code Ann. § 28.2-203(3), (4), (6) (1997 Repl. Vol.).

Furthermore, the soft crab is a special creature in the Chesapeake Bay, and she deserves, when she is most vulnerable, considerable care, in keeping with her nature and with ours. Va. Code Ann. § 28.2-203.1 (1997 Repl. Vol.).

In conclusion, the Court denies the petitioners' prayer for relief and dismisses the petition.